[L.A. No. 30737. Feb. 9, 1978.]

AMERICAN MOTORCYCLE ASSOCIATION, Petitioner, v.
THE SUPERIOR COURT OF LOS ANGELES COUNTY,
Respondent;
VIKING MOTORCYCLE CLUB et al., Real Parties in Interest.

580

**COUNSEL**

Lawler, Felix & Hall, Thomas E. Workman, Jr., Erwin E. Adler and Jane H. Barrett for Petitioner.

John W. Baker, Caywood J. Borror, Francis Breidenbach, Richard B. Goethals, Stephen J. Grogan, Henry E. Kappler, Kenneth E. Moes, W. F. Rylaarsdam and Lucien A. Van Hulle as Amici Curiae on behalf of Petitioner.

No appearance for Respondent.

Jack A. Rose for Real Parties in Interest.

William P. Camusi, Robert E. Cartwright, Edward I. Pollock, Wylie A. Aitken, Leonard Sacks, Leroy Hersh, David B. Baum, Stephen I. Zetterberg, Robert G. Beloud, Ned Good, Arne Werchick, Sanford M. Gage, Joseph Posner, Herbert Hafif and William B. Boone as Amici Curiae on behalf of Real Parties in Interest.

## OPINION

**TOBRINER, J.**—Three years ago, in *Li* v. *Yellow Cab Co.* (1975) 13 Cal.3d 804 [119 Cal.Rptr. 858, 532 P.2d 1226, 78 A.L.R.3d 393], we concluded that the harsh and much criticized contributory negligence doctrine, which totally barred an injured person from recovering damages whenever his own negligence had contributed in any degree to the injury, should be replaced in this state by a rule of comparative negligence, under which an injured individual's recovery is simply proportionately diminished, rather than completely eliminated, when he is partially responsible for the injury. In reaching the conclusion to adopt comparative negligence in *Li*, we explicitly recognized that our innovation inevitably raised numerous collateral issues, "[t]he most serious [of which] are those attendant upon the administration of a rule of comparative negligence in cases involving multiple parties." (13 Cal.3d at p. 823.) Because the *Li* litigation itself involved only a single plaintiff and a single defendant, however, we concluded that it was "neither necessary nor wise" (13 Cal.3d at p. 826) to address such multiple party questions at that juncture, and we accordingly postponed consideration of such questions until a case directly presenting such issues came before our court. The present mandamus proceeding presents such a case, and requires us to resolve a number of the thorny multiple party problems to which *Li* adverted.

For the reasons explained below, we have reached the following conclusions with respect to the multiple party issues presented by this case. First, we conclude that our adoption of comparative negligence to ameliorate the inequitable consequences of the contributory negligence rule does not warrant the abolition or contraction of the established "joint and several liability" doctrine; each tortfeasor whose negligence is a proximate cause of an indivisible injury remains individually liable for all compensable damages attributable to that injury. Contrary to petitioner's contention, we conclude that joint and several liability does not logically conflict with a comparative negligence regime. Indeed, as

we point out, the great majority of jurisdictions which have adopted comparative negligence have retained the joint and several liability rule; we are aware of no judicial decision which intimates that the adoption of comparative negligence compels the abandonment of this long-standing common law rule. The joint and several liability doctrine continues, after *Li,* to play an important and legitimate role in protecting the ability of a negligently injured person to obtain adequate compensation for his injuries from those tortfeasors who have negligently inflicted the harm.

Second, although we have determined that *Li* does not mandate a diminution of the rights of injured persons through the elimination of the joint and several liability rule, we conclude that the general principles embodied in *Li* do warrant a reevaluation of the common law equitable indemnity doctrine, which relates to the allocation of loss *among* multiple tortfeasors. As we explain, California decisions have long invoked the equitable indemnity doctrine in numerous situations to permit a "passively" or "secondarily" negligent tortfeasor to shift his liability completely to a more directly culpable party. While the doctrine has frequently prevented a more culpable tortfeasor from completely escaping liability, the rule has fallen short of its equitable heritage because, like the discarded contributory negligence doctrine, it has worked in an "all-or-nothing" fashion, imposing liability on the more culpable tortfeasor only at the price of removing liability altogether from another responsible, albeit less culpable, party.

Prior to *Li,* of course, the notion of apportioning liability on the basis of comparative fault was completely alien to California common law. In light of *Li,* however, we think that the long-recognized common law equitable indemnity doctrine should be modified to permit, in appropriate cases, a right of partial indemnity, under which liability among multiple tortfeasors may be apportioned on a comparative negligence basis. As we explain, many jurisdictions which have adopted comparative negligence have embraced similar comparative contribution or comparative indemnity systems by judicial decision. Such a doctrine conforms to *Li*'s objective of establishing "a system under which liability for damage will be borne by those whose negligence caused it in direct proportion to their respective fault." (13 Cal.3d at p. 813.)

Third, we conclude that California's current contribution statutes do not preclude our court from evolving this common law right of comparative indemnity. In *Dole* v. *Dow Chemical Company* (1972) 30 N.Y.2d 143 [331 N.Y.S.2d 382, 282 N.E.2d 288, 53 A.L.R.3d 175] the

New York Court of Appeals recognized a similar, common law partial indemnity doctrine at a time when New York had a contribution statute which paralleled California's present legislation. Moreover, the California contribution statute, by its own terms, expressly subordinates its provisions to common law indemnity rules; since the comparative indemnity rule we recognize today is simply an evolutionary development of the common law equitable indemnity doctrine, the primacy of such right of indemnity is expressly recognized by the statutory provisions. In addition, the equitable nature of the comparative indemnity doctrine does not thwart, but enhances, the basic objective of the contribution statute, furthering an equitable distribution of loss among multiple tortfeasors.

Fourth, and finally, we explain that under the governing provisions of the Code of Civil Procedure, a named defendant is authorized to file a cross-complaint against any person, whether already a party to the action or not, from whom the named defendant seeks to obtain total or partial indemnity. Although the trial court retains the authority to postpone the trial of the indemnity question if it believes such action is appropriate to avoid unduly complicating the plaintiff's suit, the court may not preclude the filing of such a cross-complaint altogether.

In light of these determinations, we conclude that a writ of mandate should issue, directing the trial court to permit petitioner-defendant to file a cross-complaint for partial indemnity against previously unjoined alleged concurrent tortfeasors.

### 1. The facts

In the underlying action in this case, plaintiff Glen Gregos, a teenage boy, seeks to recover damages for serious injuries which he incurred while participating in a cross-country motorcycle race for novices. Glen's second amended complaint alleges, in relevant part, that defendants American Motorcycle Association (AMA) and the Viking Motorcycle Club (Viking)—the organizations that sponsored and collected the entry fee for the race—negligently designed, managed, supervised and administered the race, and negligently solicited the entrants for the race. The second amended complaint further alleges that as a direct and proximate cause of such negligence, Glen suffered a crushing of his spine, resulting in the permanent loss of the use of his legs and his permanent inability to perform sexual functions. Although the negligence count of the complaint does not identify the specific acts or omissions of which plaintiff complains, additional allegations in the complaint assert, inter alia, that

defendants failed to give the novice participants reasonable instructions that were necessary for their safety, failed to segregate the entrants into reasonable classes of equivalently skilled participants, and failed to limit the entry of participants to prevent the racecourse from becoming overcrowded and hazardous.[1]

AMA filed an answer to the complaint, denying the charging allegations and asserting a number of affirmative defenses, including a claim that Glen's own negligence was a proximate cause of his injuries. Thereafter, AMA sought leave of court to file a cross-complaint, which purported to state two causes of action against Glen's parents. The first cause of action alleges that at all relevant times Glen's parents (1) knew that motorcycle racing is a dangerous sport, (2) were "knowledgeable and fully cognizant" of the training and instruction which Glen had received on the handling and operation of his motorcycle, and (3) directly participated in Glen's decision to enter the race by signing a parental consent form. This initial cause of action asserts that in permitting Glen's entry into the race, his parents negligently failed to exercise their power of supervision over their minor child; moreover, the cross-complaint asserts that while AMA's negligence, if any, was "passive," that of Glen's parents was "active." On the basis of these allegations, the first cause of action seeks indemnity from Glen's parents if AMA is found liable to Glen.

In the second cause of action of its proposed cross-complaint, AMA seeks declaratory relief. It reasserts Glen's parents' negligence, declares that Glen has failed to join his parents in the action, and asks for a declaration of the "allocable negligence" of Glen's parents so that "the damages awarded [against AMA], if any, [may] be reduced by the percentage of damages allocable to cross-defendants' negligence." As more fully explained in the accompanying points and authorities, this second cause of action is based on an implicit assumption that the *Li* decision abrogates the rule of joint and several liability of concurrent tortfeasors and establishes in its stead a new rule of "proportionate liability," under which each concurrent tortfeasor who has proximately

---

[1] Glen's second amended complaint is framed in six counts and names, in addition to AMA and Viking, numerous individual Viking officials and the Continental Casualty Company of Chicago (AMA's insurer) as defendants. In addition to seeking recovery on the basis of negligence, plaintiff claims that various defendants (1) were guilty of fraud and misrepresentation in relation to the race, (2) acted in bad faith in refusing to settle a medical reimbursement claim allegedly covered by insurance and (3) intentionally inflicted emotional distress upon him. Only the negligence claim, however, is relevant to the present proceeding.

caused an indivisible harm may be held liable only for a *portion* of plaintiff's recovery, determined on a comparative fault basis.

The trial court, though candidly critical of the current state of the law, concluded that existing legal doctrines did not support AMA's proposed cross-complaint, and accordingly denied AMA's motion for leave to file the cross-complaint. AMA petitioned the Court of Appeal for a writ of mandate to compel the trial court to grant its motion, and the Court of Appeal, recognizing the recurrent nature of the issues presented and the need for a speedy resolution of these multiple party questions, issued an alternative writ; ultimately, the court granted a peremptory writ of mandate. In view of the obvious statewide importance of the questions at issue, we ordered a hearing in this case on our own motion. All parties concede that the case is properly before us.

2. ■ *The adoption of comparative negligence in Li does not warrant the abolition of joint and several liability of concurrent tortfeasors.*

In evaluating the propriety of the trial court's ruling, we begin with a brief review of the established rights of injured persons vis-à-vis negligent tortfeasors under current law. ■ Under well-established common law principles, a negligent tortfeasor is generally liable for all damage of which his negligence is *a* proximate cause; stated another way, in order to recover damages sustained as a result of an indivisible injury, a plaintiff is not required to prove that a tortfeasor's conduct was *the sole* proximate cause of the injury, but only that such negligence was *a* proximate cause. (See generally 4 Witkin, Summary of Cal. Law (8th ed. 1974) Torts, § 624, pp. 2906-2907 and cases cited; Rest.2d Torts, §§ 432, subd. (2), 439.) This result follows from Civil Code section 1714's declaration that "[e]very one is responsible . . . for an injury occasioned to another by his want of ordinary care or skill. . . ." A tortfeasor may not escape this responsibility simply because another act—either an "inno-cent" occurrence such as an "act of God" or other negligent conduct—may also have been a cause of the injury.

In cases involving multiple tortfeasors, the principle that each tortfea-sor is personally liable for any indivisible injury of which his negligence is a proximate cause has commonly been expressed in terms of "joint and several liability." As many commentators have noted, the "joint and several liability" concept has sometimes caused confusion because the terminology has been used with reference to a number of distinct situations. (See, e.g., Prosser, Law of Torts (4th ed. 1971) §§ 46, 47,

pp. 291-299; 1 Harper & James, Law of Torts (1956) § 10.1, pp. 692-709.) The terminology originated with respect to tortfeasors who acted in concert to commit a tort, and in that context it reflected the principle, applied in both the criminal and civil realm, that all members of a "conspiracy" or partnership are equally responsible for the acts of each member in furtherance of such conspiracy.

Subsequently, the courts applied the "joint and several liability" terminology to other contexts in which a preexisting relationship between two individuals made it appropriate to hold one individual liable for the act of the other; common examples are instances of vicarious liability between employer and employee or principal and agent, or situations in which joint owners of property owe a common duty to some third party. In these situations, the joint and several liability concept reflects the legal conclusion that one individual may be held liable for the consequences of the negligent act of another.

In the concurrent tortfeasor context, however, the "joint and several liability" label does not express the imposition of any form of vicarious liability, but instead simply embodies the general common law principle, noted above, that a tortfeasor is liable for any injury of which his negligence is *a* proximate cause. Liability attaches to a concurrent tortfeasor in this situation not because he is responsible for the acts of other independent tortfeasors who may also have caused the injury, but because he is responsible for all damage of which his own negligence was a proximate cause. When independent negligent actions of a number of tortfeasors are each a proximate cause of a single injury, each tortfeasor is thus personally liable for the damage sustained, and the injured person may sue one or all of the tortfeasors to obtain a recovery for his injuries; the fact that one of the tortfeasors is impecunious or otherwise immune from suit does not relieve another tortfeasor of his liability for damage which he himself has proximately caused.

Prior to *Li,* of course, a negligent tortfeasor's liability was limited by the draconian contributory negligence doctrine; under that doctrine, a negligent tortfeasor escaped liability for injuries which he had proximately caused to another whenever the injured person's lack of due care for his own safety was also a proximate cause of the injury. In *Li,* however, we repudiated the contributory negligence rule, recognizing with Dean Prosser that " '[p]robably the true explanation [of the doctrine's development in this country was] that the courts [of the 19th century] found in this defense, along with the concepts of duty and proximate cause, a convenient instrument of control over the jury, by which the liabilities of

rapidly growing industry were curbed and kept within bounds.'" (13 Cal.3d at p. 811, fn. 4 (quoting Prosser, *Comparative Negligence* (1953) 41 Cal.L.Rev. 1, 4); cf. *Dillon* v. *Legg* (1968) 68 Cal.2d 728, 734-735 [69 Cal.Rptr. 72, 441 P.2d 912, 29 A.L.R.3d 1316].) Concluding that any such rationale could no longer justify the complete elimination of an injured person's right to recover for negligently inflicted injury, we held in *Li* that "in all actions for negligence resulting in injury to person or property, the contributory negligence of the person injured in person or property shall not bar recovery, but the damages awarded shall be diminished in proportion to the amount of negligence attributable to the person recovering." (13 Cal.3d at p. 829.)

In the instant case AMA argues that the *Li* decision, by repudiating the all-or-nothing contributory negligence rule and replacing it by a rule which simply diminishes an injured party's recovery on the basis of his comparative fault, in effect undermined the fundamental rationale of the entire joint and several liability doctrine as applied to concurrent tortfeasors. In this regard AMA cites the following passage from *Finnegan* v. *Royal Realty Co.* (1950) 35 Cal.2d 409, 433-434 [218 P.2d 17]: "Even though persons are not acting in concert, if the result[s] produced by their acts are indivisible, each person is held liable for the whole. . . . *The reason for imposing liability on each for the entire consequences is that there exists no basis for dividing damages and the law is loath to permit an innocent plaintiff to suffer as against a wrongdoing defendant.* This liability is imposed where each cause is sufficient in itself as well as where each cause is required to produce the result." (Italics added.) Focusing on the emphasized sentence, AMA argues that after *Li* (1) there *is* a basis for dividing damages, namely on a comparative negligence basis, and (2) a plaintiff is no longer necessarily "innocent," for *Li* permits a negligent plaintiff to recover damages. AMA maintains that in light of these two factors it is logically inconsistent to retain joint and several liability of concurrent tortfeasors after *Li.* As we explain, for a number of reasons we cannot accept AMA's argument.

First, the simple feasibility of apportioning fault on a comparative negligence basis does not render an indivisible injury "divisible" for purposes of the joint and several liability rule. As we have already explained, a concurrent tortfeasor is liable for the whole of an indivisible injury whenever his negligence is a proximate cause of that injury. In many instances, the negligence of each of several concurrent tortfeasors may be sufficient, in itself, to cause the entire injury; in other instances, it is simply impossible to determine whether or not a particular concurrent

tortfeasor's negligence, acting alone, would have caused the same injury. Under such circumstances, a defendant has no equitable claim vis-à-vis an injured plaintiff to be relieved of liability for damage which he has proximately caused simply because some other tortfeasor's negligence may also have caused the same harm. In other words, the mere fact that it may be possible to assign some percentage figure to the relative culpability of one negligent defendant as compared to another does not in any way suggest that each defendant's negligence is not a proximate cause of the entire indivisible injury.

Second, abandonment of the joint and several liability rule is not warranted by AMA's claim that, after *Li,* a plaintiff is no longer "innocent." Initially, of course, it is by no means invariably true that after *Li* injured plaintiffs will be guilty of negligence. In many instances a plaintiff will be completely free of all responsibility for the accident, and yet, under the proposed abolition of joint and several liability, such a completely faultless plaintiff, rather than a wrongdoing defendant, would be forced to bear a portion of the loss if any one of the concurrent tortfeasors should prove financially unable to satisfy his proportioned share of the damages.

Moreover, even when a plaintiff is partially at fault for his own injury, a plaintiff's culpability is not equivalent to that of a defendant. In this setting, a plaintiff's negligence relates only to a failure to use due care for his own protection, while a defendant's negligence relates to a lack of due care for the safety of others. ▆ ▆▆▆ Although we recognized in *Li* that a plaintiff's self-directed negligence would justify reducing his recovery in proportion to his degree of fault for the accident,[2] the fact remains that insofar as the plaintiff's conduct creates

---

[2]A question has arisen as to whether our *Li* opinion, in mandating that a plaintiff's recovery be diminished in proportion to the plaintiff's negligence, intended that the plaintiff's conduct be compared with each individual tortfeasor's negligence, with the cumulative negligence of all named defendants or with all other negligent conduct that contributed to the injury. The California BAJI Committee, which specifically addressed this issue after *Li,* concluded that "the contributory negligence of the plaintiff must be proportioned to the combined negligence of plaintiff and of all the tort-feasors, whether or not joined as parties . . . whose negligence proximately caused or contributed to plaintiff's injury." (Use note, BAJI No. 14.90 (5th ed. 1975 pocket pt.) p. 152.)

We agree with this conclusion, which finds support in decisions from other comparative negligence jurisdictions. (See, e.g., *Pierringer* v. *Hoger* (1963) 21 Wis.2d 182 [124 N.W.2d 106]; *Walker* v. *Kroger Grocery & Baking Co.* (1934) 214 Wis. 519 [252 N.W. 721, 727-728].) In determining to what degree the injury was due to the fault of the plaintiff, it is logically essential that the plaintiff's negligence be weighed against the combined total of all other causative negligence; moreover, inasmuch as a plaintiff's actual damages do not vary by virtue of the particular defendants who happen to be before the court, we do not think that the damages which a plaintiff may recover against defendants who are joint and severally liable should fluctuate in such a manner.

only a risk of self-injury, such conduct, unlike that of a negligent defendant, is not tortious. (See Prosser, Law of Torts, *supra,* § 65, p. 418.)

Finally, from a realistic standpoint, we think that AMA's suggested abandonment of the joint and several liability rule would work a serious and unwarranted deleterious effect on the practical ability of negligently injured persons to receive adequate compensation for their injuries. One of the principal by-products of the joint and several liability rule is that it frequently permits an injured person to obtain full recovery for his injuries even when one or more of the responsible parties do not have the financial resources to cover their liability. In such a case the rule recognizes that fairness dictates that the "wronged party should not be deprived of his right to redress," but that "[t]he wrongdoers should be left to work out between themselves any apportionment." (*Summers* v. *Tice* (1948) 33 Cal.2d 80, 88 [199 P.2d 1, 5 A.L.R.2d 91].) The *Li* decision does not detract in the slightest from this pragmatic policy determination.

For all of the foregoing reasons, we reject AMA's suggestion that our adoption of comparative negligence logically compels the abolition of joint and several liability of concurrent tortfeasors. Indeed, although AMA fervently asserts that the joint and several liability concept is totally incompatible with a comparative negligence regime, the simple truth is that the overwhelming majority of jurisdictions which have adopted comparative negligence have retained the joint and several liability doctrine. As Professor Schwartz notes in his treatise on comparative negligence: "The concept of joint and several liability of tortfeasors has been retained under comparative negligence, unless the statute specifically abolishes it, in all states that have been called upon to decide the question." (Schwartz, Comparative Negligence (1974) § 16.4, p. 253; see, e.g., *Gazaway* v. *Nicholson* (1940) 190 Ga. 345 [9 S.E.2d 154, 156]; *Saucier* v. *Walker* (Miss. 1967) 203 So.2d 299, 302-303; *Kelly* v. *Long Island Lighting Co.* (1972) 31 N.Y.2d 25, 30 [334 N.Y.S.2d 851, 855, 286 N.E.2d 241, 243]; *Walker* v. *Kroger Grocery & Baking Co., supra,* 214 Wis. 519 [252 N.W. 721, 727]; *Chille* v. *Howell* (1967) 34 Wis.2d 491 [149 N.W.2d 600, 605]. See also U. Comp. Fault Act, § 2, subd. (c).) AMA has not cited a single judicial authority to support its contention that the advent of comparative negligence rationally compels the demise of the joint and several liability rule. Under the circumstances, we hold that after *Li,* a concurrent tortfeasor whose negligence is a proximate cause of an indivisible injury remains liable for the total amount of damages, diminished only "in proportion to the amount of negligence attributable to the person recovering." (13 Cal.3d at p. 829.)

3. ▮ *Upon reexamination of the common law equitable indemnity doctrine in light of the principles underlying Li, we conclude that the doctrine should be modified to permit partial indemnity among concurrent tortfeasors on a comparative fault basis.*

Although, as discussed above, we are not persuaded that our decision in *Li* calls for a fundamental alteration of the rights of injured plaintiffs vis-à-vis concurrent tortfeasors through the abolition of joint and several liability, the question remains whether the broad principles underlying *Li* warrant any modification of this state's common law rules governing the allocation of loss *among* multiple tortfeasors. As we shall explain, the existing California common law equitable indemnity doctrine—while ameliorating inequity and injustice in some extreme cases—suffers from the same basic "all-or-nothing" deficiency as the discarded contributory negligence doctrine and falls considerably short of fulfilling *Li*'s goal of "a system under which liability for damage will be borne by those whose negligence caused it in direct proportion to their respective fault." (13 Cal.3d at p. 813.) Taking our cue from a recent decision of the highest court of one of our sister states, we conclude—in line with *Li*'s objectives—that the California common law equitable indemnity doctrine should be modified to permit a concurrent tortfeasor to obtain partial indemnity from other concurrent tortfeasors on a comparative fault basis.

In California, as in most other American jurisdictions, the allocation of damages among multiple tortfeasors has historically been analyzed in terms of two, ostensibly mutually exclusive, doctrines: contribution and indemnification. In traditional terms, the apportionment of loss between multiple tortfeasors has been thought to present a question of contribution; indemnity, by contrast, has traditionally been viewed as concerned solely with whether a loss should be entirely shifted from one tortfeasor to another, rather than whether the loss should be shared between the two. (See, e.g., *Alisal Sanitary Dist.* v. *Kennedy* (1960) 180 Cal.App.2d 69, 74-75 [4 Cal.Rptr. 379]; *Atchison, T. & S. F. Ry. Co.* v. *Lan Franco* (1968) 267 Cal.App.2d 881, 886 [73 Cal.Rptr. 660].) As we shall explain, however, the dichotomy between the two concepts is more formalistic than substantive,[3] and the common goal of both doctrines, the equitable distribution of loss among multiple tortfeasors, suggests a need for a reexamination of the relationship of these twin concepts. (See generally

---

[3]As Judge Learned Hand observed more than a quarter of a century ago: "[I]ndemnity is only an extreme form of contribution." (*Slattery* v. *Marra Bros.* (2d Cir. 1951) 186 F.2d 134, 138.)

Werner, *Contribution and Indemnity in California* (1969) 57 Cal.L.Rev. 490.)

Early California decisions, relying on the ancient saw that "the law will not aid a wrongdoer," embraced the then ascendant common law rule denying a tortfeasor any right to contribution whatsoever. (See, e.g., *Dow* v. *Sunset Tel. & Tel. Co.* (1912) 162 Cal. 136 [121 P. 379].) In 1957, the California Legislature enacted a bill to ameliorate the harsh effects of that "no contribution" rule; this legislation did not, however, sweep aside the old rule altogether, but instead made rather modest inroads into the contemporary doctrine, restricting a tortfeasor's statutory right of contribution to a narrow set of circumstances. We discuss the effect of the 1957 contribution legislation in more detail below; at this point it is sufficient to note that the passage of the 1957 legislation had the effect of foreclosing any evolution of the California common law contribution doctrine beyond its pre-1957 "no contribution" state. Over the past two decades, common law developments with respect to the allocation of loss between joint tortfeasors in this state have all been channeled instead through the equitable indemnity doctrine. (Cf. *Bielski* v. *Schulze* (1962) 16 Wis.2d 1 [114 N.W.2d 105, 107-111]; *Packard* v. *Whitten* (Me. 1971) 274 A.2d 169, 179-180.)

Although early common law decisions established the broad rule that a tortfeasor was never entitled to contribution, it was not long before situations arose in which the obvious injustice of requiring one tortfeasor to bear an entire loss while another more culpable tortfeasor escaped with impunity led common law courts to develop an equitable exception to the no contribution rule. (See generally Leflar, *Contribution and Indemnity Between Tortfeasors* (1932) 81 U.Pa.L.Rev. 130, 146-158.) As Chief Justice Gibson observed in *Peters* v. *City & County of San Francisco* (1953) 41 Cal.2d 419, 431 [260 P.2d 55]: "[T]he rule against contribution between joint tortfeasors admits of some exceptions, and a right of indemnification may arise as a result of contract *or equitable considerations* and is not restricted to situations involving a wholly vicarious liability, such as where a master has paid a judgment for damages resulting from the voluntary act of his servant." (Italics added.)

Our court first applied the equitable indemnity doctrine in *City & County of S. F.* v. *Ho Sing* (1958) 51 Cal.2d 127 [330 P.2d 802]. In *Ho Sing,* a property owner, with the city's permission, had replaced part of the sidewalk in front of his building with a sidewalk-level skylight to provide more light for his basement. After a number of years, a crack developed in the skylight and a pedestrian tripped over the crack and

sustained serious injuries. Prior cases of our court had recognized that in such a situation both the city, which had a general duty to inspect and maintain the sidewalk, and the property owner who had altered the sidewalk for his own benefit, were jointly and severally liable for resulting damages; the injured pedestrian accordingly sued both the city and the property owner and recovered a joint judgment against both. After the city had paid a substantial part of the judgment, it brought its own action against Ho Sing, the property owner, seeking indemnification.

Although carefully emphasizing that the city's liability to the injured pedestrian was not "merely dependent or derivative" but was "joint and direct," the *Ho Sing* court nonetheless permitted the city to obtain indemnification from the negligent property owner. Pointing out that a majority of common law jurisdictions permitted equitable indemnity in such a situation, the *Ho Sing* court relied heavily on, and quoted at some length from, the United States Supreme Court decision of *Washington Gas Co.* v. *Dist. of Columbia* (1896) 161 U.S. 316 [40 L.Ed. 712, 16 S.Ct. 564]. In *Washington Gas,* the Supreme Court explained: "The principle [of equitable indemnity] qualifies and restrains within just limits the rigor of the rule which forbids recourse between wrongdoers . . . . 'Our law . . . does not in every case disallow an action, by one wrongdoer against another, to recover damages incurred in consequence of their joint offense. The rule is, *in pari delicto potior est conditio defendentis.* If the parties are not equally criminal, the principal delinquent may be held responsible to his co-delinquent for damages incurred by their joint offense. In respect to offenses, in which is involved any moral delinquency or turpitude, all parties are deemed equally guilty, and courts will not inquire into their relative guilt. But where the offense is merely *malum prohibitum,* and is in no respect immoral, it is not against the policy of the law to inquire into the relative delinquency of the parties, and to administer justice between them, although both parties are wrongdoers.'" (161 U.S. at pp. 327-328 [40 L.Ed. at pp. 718-719].)

As this passage clearly reveals, the equitable indemnity doctrine originated in the common sense proposition that when two individuals are responsible for a loss, but one of the two is more culpable than the other, it is only fair that the more culpable party should bear a greater share of the loss. Of course, at the time the doctrine developed, common law precepts precluded any attempt to ascertain comparative fault; as a consequence, equitable indemnity, like the contributory negligence doctrine, developed as an all-or-nothing proposition.

Because of the all-or-nothing nature of the equitable indemnity rule, courts were, from the beginning, understandably reluctant to shift the entire loss to a party who was simply slightly more culpable than another. As a consequence, throughout the long history of the equitable indemnity doctrine courts have struggled to find some linguistic formulation that would provide an appropriate test for determining when the relative culpability of the parties is sufficiently disparate to warrant placing the entire loss on one party and completely absolving the other.

A review of the numerous California cases in this area reveals that the struggle has largely been a futile one. (Compare and contrast, e.g., *Gardner* v. *Murphy* (1975) 54 Cal.App.3d 164, 168-171 [126 Cal.Rptr. 302]; *Niles* v. *City of San Rafael* (1974) 42 Cal.App.3d 230, 237-240 [116 Cal.Rptr. 733]; *Kerr Chemicals, Inc.* v. *Crown Cork & Seal Co.* (1971) 21 Cal.App.3d 1010, 1014-1017 [99 Cal.Rptr. 162]; *Pearson Ford Co.* v. *Ford Motor Co.* (1969) 273 Cal.App.2d 269, 271-278 [78 Cal.Rptr. 279]; *Aerojet General Corp.* v. *D. Zelinsky & Sons* (1967) 249 Cal.App.2d 604, 607-612 [57 Cal.Rptr. 701]; *Herrero* v. *Atkinson* (1964) 227 Cal.App.2d 69, 73-78 [38 Cal.Rptr. 490, 8 A.L.R.3d 629]; *Cahill Bros., Inc.* v. *Clementina Co.* (1962) 208 Cal.App.2d 367, 375-384 [25 Cal.Rptr. 301]; *Alisal Sanitary Dist.* v. *Kennedy, supra,* 180 Cal.App.2d 69, 74-82. See generally Note, *Products Liability, Comparative Negligence, and the Allocation of Damages Among Multiple Defendants* (1976) 50 So.Cal.L.Rev. 73, 82-83; Comment, *The Allocation of Loss Among Joint Tortfeasors* (1968) 41 So.Cal.L.Rev. 728, 737-743.)

As one Court of Appeal has charitably stated: "The cases are not always helpful in determining whether equitable indemnity lies. The test[s] utilized in applying the doctrine are vague. Some authorities characterize the negligence of the indemnitor as 'active,' 'primary,' or 'positive,' and the negligence of the indemnitee as 'passive,' 'secondary,' or 'negative.' [Citations.] Other authorities indicate that the application of the doctrine depends on whether the claimant's liability is 'primary,' 'secondary,' 'constructive,' or 'derivative.' [Citations.] These formulations have been criticized as being artificial and as lacking the objective criteria desirable for predictability in the law. [Citations.]" (*Atchison, T. & S. F. Ry. Co.* v. *Lan Franco, supra,* 267 Cal.App.2d 881, 886.)

Indeed, some courts, as well as some prominent commentators,[4] after reviewing the welter of inconsistent standards utilized in the equitable

---

[4]Dean Prosser was at a loss in attempting to state the applicable standard: "Out of all this, it is extremely difficult to state any general rule or principle as to when indemnity

indemnity realm, have candidly eschewed any pretense of an objectively definable equitable indemnity test. In *Herrero* v. *Atkinson, supra,* 227 Cal.App.2d 69, 74, for example, the court ultimately concluded that "[t]he duty to indemnify may arise, and indemnity may be allowed in those fact situations *where in equity and good conscience the burden of the judgment should be shifted from the shoulders of the person seeking indemnity to the one from whom indemnity is sought.* The right depends upon the principle that everyone is responsible for the consequences of his own wrong, and if others have been compelled to pay damages which ought to have been paid by the wrongdoer, they may recover from him. Thus the determination of whether or not indemnity should be allowed must of necessity depend upon the facts of each case." (Italics added.)

If the fundamental problem with the equitable indemnity doctrine as it has developed in this state were simply a matter of an unduly vague or imprecise linguistic standard, the remedy would be simply to attempt to devise a more definite verbal formulation. In our view, however, the principal difficulty with the current equitable indemnity doctrine rests not simply on a question of terminology, but lies instead in the all-or-nothing nature of the doctrine itself. Although California cases have steadfastly maintained that the doctrine is founded upon "equitable considerations" (*Peters* v. *City & County of San Francisco, supra,* 41 Cal.2d 419, 431) and "is based on inherent injustice" (*Atchison, T. & S. F. Ry. Co.* v. *Lan Franco, supra,* 267 Cal.App.2d 881, 886), the all-or-nothing aspect of the doctrine has precluded courts from reaching a just solution in the great majority of cases in which equity and fairness call for an apportionment of loss between the wrongdoers in proportion to their relative culpability, rather than the imposition of the entire loss upon one or the other tortfeasor.

The case of *Ford Motor Co.* v. *Robert J. Poeschl, Inc.* (1971) 21 Cal.App.3d 694 [98 Cal.Rptr. 702] (hereafter *Poeschl*) illuminates the problem. In *Poeschl,* the Ford Motor Company had sent a recall notice

---

will be allowed and when it will not. It has been said that it is permitted only where the indemnitor has owed a duty of his own to the indemnitee; that it is based on a 'great difference' in the gravity of the fault of the two tortfeasors; or that it rests upon a disproportion or difference in character of the duties owed by the two to the injured plaintiff. Probably none of these is the complete answer, and, as is so often the case in the law of torts, no one explanation can be found which will cover all the cases. Indemnity is a shifting of responsibility from the shoulders of one person to another; and the duty to indemnify will be recognized in cases where community opinion would consider that in justice the responsibility should rest upon one rather than the other. This may be because of the relation of the parties to one another, and the consequent duty owed; or it may be because of a significant difference in the kind or quality of their conduct." (Fns. omitted.) (Prosser, Law of Torts, *supra,* § 52, p. 313.)

to its dealers requesting the recall of designated 1964 Thunderbird automobiles for servicing of the cars' rear brake lights. A dealer and leasing agency had failed to recall one such car which had been leased to a customer and shortly thereafter the defect in the rear brake light caused an accident. The injured customer sued Ford, the dealer and the leasing agency, and Ford settled the customer's claim for $72,000; when the other defendants refused to reimburse it for any part of the settlement, Ford brought an action for indemnification.

Analyzing Ford's claim in terms of the elusive "active-passive," "primary-secondary," "direct-indirect" standards utilized by prior decisions, the *Poeschl* court determined that Ford was not entitled to obtain total indemnification. The court reasoned: "Ford's production of the defective car, coupled with its failure to attempt direct notice to the customer, breached a direct obligation it owed to the latter. Ford had a 'last clear chance' to avert injury and failed to use it. Its fault is primary, not secondary, and not imputed to it as a consequence of the dealer's or leasing agency's fault. Under the pleaded circumstances, the latter are not liable for indemnification of the manufacturer." (21 Cal.App.3d at p. 699.)

After finding that total indemnification of the manufacturer was inappropriate, the *Poeschl* court revealed its misgivings with the existing equitable indemnity doctrine which sanctioned the inequitable result of permitting the dealer and leasing agency to escape all liability whatsoever. The court observed: "The dealer and the leasing agency shared Ford's ability to reach the customer before an accident occurred. The complaint does not disclose whether these firms were stirred by the recall notice. On the assumption that they did nothing, their escape from financial responsibility is troublesome. Judicially favored objectives of deterrence and accident prevention would be promoted by imposing some liability on a dealer who knew of danger and did nothing. To shift the entire loss to him would not serve these objectives, for then the manufacturer would escape scot-free. *A wise rule of law—one designed to stimulate responsibility throughout the merchandising chain—would require both parties to share the loss. A rule of contribution or partial indemnification would permit that result.* In California the common law rule against contribution among tortfeasors has been modified to the extent of permitting contribution only after a joint judgment against them. (Code Civ. Proc., §§ 875-879.) *Under California law to date, indemnification is an all-or-nothing proposition.* Thus, the law leaves these parties where it finds them, denying any indemnity to the originator of

the accident-producing factors." (Italics added.) (21 Cal.App.3d at p. 699.)

In noting that "under California law *to date,* indemnification is an all-or-nothing proposition," the *Poeschl* court recognized that by virtue of its developmental character, the common law was capable of evolving the equitable indemnity doctrine into a rule which would permit the equitable *sharing* of loss between multiple tortfeasors. The proof of the *Poeschl* court's prescience was not long in coming.

Just one year after the *Poeschl* decision, the New York Court of Appeals, in the celebrated decision of *Dole* v. *Dow Chemical Company, supra,* 30 N.Y.2d 143 [331 N.Y.S.2d 382], modified that state's traditional all-or-nothing indemnity doctrine to permit a tortfeasor to obtain "partial indemnification" from another tortfeasor on the basis of comparative fault. The *Dole* court, after noting that the previously existing "active-passive" indemnification test "has in practice proven elusive and difficult of fair application," went on to observe: "But the policy problem involves more than terminology. If indemnification is allowed at all among joint tort-feasors, the important resulting question is how ultimate responsibility should be distributed. There are situations when the facts would in fairness warrant what [the named defendant] here seeks—passing on to [a concurrent tortfeasor] all responsibility that may be imposed on [the named defendant] for negligence, a traditional full indemnification. There are circumstances where the facts would not, by the same test of fairness, warrant passing on to a third party any of the liability imposed. There are circumstances which would justify apportionment of responsibility between third-party plaintiff and third-party defendant, in effect a partial indemnification." (331 N.Y.S.2d at p. 386.)

Concluding that the all-or-nothing common law indemnity doctrine did not, in many situations, produce the equitable allocation of loss to which it aimed, the *Dole* court proceeded to modify the doctrine, holding that the "[r]ight to apportionment of liability or to full indemnity, . . . as among parties involved together in causing damage by negligence, should rest on relative responsibility. . . ." (331 N.Y.S.2d at pp. 391-392.) The *Dole* court was undeterred from undertaking this modification of the prior common law indemnity doctrine either by the existence of a contribution statute which, like that currently in force in California, provided joint tortfeasors with a right of pro rata contribution in limited circumstances, or by the fact that at that time New York still adhered to the all-or-nothing contributory negligence doctrine.

Two and one-half months after the rendition of *Dole,* the New York Court of Appeals, in *Kelly* v. *Long Island Lighting Co., supra,* 31 N.Y.2d 25 [334 N.Y.S.2d 851], emphatically reaffirmed the *Dole* decision and explained the effect of its holding. The *Kelly* court stated: "Prior to our recent decision in Dole v. Dow Chem. Co., . . . it had been held to be the rule that a defendant found guilty of 'active' negligence could not recover over against another guilty of 'active' tort negligence. The rule as stated in *Dole* now permits apportionment of damages among joint or concurrent tort-feasors regardless of the degree or nature of the concurring fault. We believe the new rule of apportionment to be pragmatically sound, as well as realistically fair. To require a joint tort-feasor who is, for instance, 10% causally negligent to pay the same amount as a co-tort-feasor who is 90% causally negligent seems inequitable and unjust. The fairer rule, we believe, is to distribute the loss in proportion to the allocable concurring fault." (334 N.Y.S.2d at p. 854.)

The considerations embodied in the *Dole* and *Kelly* opinions mirror precisely the principles enunciated by our own court three years ago in *Li.* In *Li,* after concluding "that logic, practical experience, and fundamental justice counsel against the retention of the doctrine rendering contributory negligence a complete bar to recovery" (13 Cal.3d at pp. 812-813), we made clear our conviction that the discarded doctrine "should be replaced in this state *by a system under which liability for damage will be borne by those whose negligence caused it in direct proportion to their respective fault.*" (Italics added.) (*Id.,* at p. 813.)

In order to attain such a system, in which liability for an indivisible injury caused by concurrent tortfeasors will be borne by each individual tortfeasor "in direct proportion to [his] respective fault," we conclude that the current equitable indemnity rule should be modified to permit a concurrent tortfeasor to obtain partial indemnity from other concurrent tortfeasors on a comparative fault basis. In reaching this conclusion, we point out that in recent years a great number of courts, particularly in jurisdictions which follow the comparative negligence rule, have for similar reasons adopted, as a matter of common law, comparable rules providing for comparative contribution or comparative indemnity. (See, e.g., *United States* v. *Reliable Transfer Co.* (1975) 421 U.S. 397, 405-411 [44 L.Ed.2d 251, 258-262, 95 S.Ct. 1708]; *Kohr* v. *Allegheny Airlines, Inc.* (7th Cir. 1974) 504 F.2d 400, 405; *Gomes* v. *Brodhurst* (3d Cir. 1967) 394 F.2d 465, 467-470; *Packard* v. *Whitten, supra,* 274 A.2d 169, 179-180; *Bielski* v. *Schulze, supra,* 114 N.W.2d 105, 107-114; cf. *Lincenberg* v. *Issen* (Fla. 1975) 318 So.2d 386, 389-391. See also U. Comp. Fault Act, § 4, subd. (a).)

4. *California's contribution statutes do not preclude this court from adopting comparative partial indemnity as a modification of the common law equitable indemnity doctrine.*

None of the parties to the instant proceeding, and none of the numerous amici who have filed briefs, seriously takes issue with our conclusion that a rule of comparative partial indemnity is more consistent with the principles underlying *Li* than the prior "all-or-nothing" indemnity doctrine. The principal argument raised in opposition to the recognition of a common law comparative indemnity rule is the claim that California's existing contribution statutes, section 875 et seq. of the Code of Civil Procedure,[5] preclude such a judicial development. As we explain, we reject the contention on a number of grounds.

---

[5]Sections 875 to 879 provide in full:

Section 875:

"(a) Where a money judgment has been rendered jointly against two or more defendants in a tort action there shall be a right of contribution among them as hereinafter provided.

"(b) Such right of contribution shall be administered in accordance with the principles of equity.

"(c) Such right of contribution may be enforced only after one tortfeasor has, by payment, discharged the joint judgment or has paid more than his pro rata share thereof. It shall be limited to the excess so paid over the pro rata share of the person so paying and in no event shall any tortfeasor be compelled to make contribution beyond his own pro rata share of the entire judgment.

"(d) There shall be no right of contribution in favor of any tortfeasor who has intentionally injured the injured person.

"(e) A liability insurer who by payment has discharged the liability of a tortfeasor judgment debtor shall be subrogated to his right of contribution.

"(f) This title shall not impair any right of indemnity under existing law, and where one tortfeasor judgment debtor is entitled to indemnity from another there shall be no right of contribution between them.

"(g) This title shall not impair the right of a plaintiff to satisfy a judgment in full as against any tortfeasor judgment debtor."

Section 876:

"(a) The pro rata share of each tortfeasor judgment debtor shall be determined by dividing the entire judgment equally among all of them.

"(b) Where one or more persons are held liable solely for the tort of one of them or of another, as in the case of the liability of a master for the tort of his servant, they shall contribute a single pro rata share, as to which there may be indemnity between them."

Section 877:

"Where a release, dismissal with or without prejudice, or a covenant not to sue or not to enforce judgment is given in good faith before verdict or judgment to one or more of a number of tortfeasors claimed to be liable for the same tort—

"(a) It shall not discharge any other such tortfeasor from liability unless its terms so provide, but it shall reduce the claims against the others in the amount stipulated by the release, the dismissal or the covenant, or in the amount of the consideration paid for it whichever is the greater; and

"(b) It shall discharge the tortfeasor to whom it is given from all liability for any contribution to any other tortfeasors."

First, as we have already noted, the New York Court of Appeals adopted a similar partial indemnity rule in *Dole* v. *Dow Chemical Company, supra,* 331 N.Y.S.2d 382 despite the existence of a closely comparable statutory contribution scheme.[6] Like the current California legislation, the New York contribution statute in force at the time of *Dole* afforded a right of contribution only between joint judgment debtors, and provided that contribution should be determined on a "pro

Section 877.5:

"(a) Where an agreement or covenant is made which provides for a sliding scale recovery agreement between one or more, but not all, alleged defendant tortfeasors and the plaintiff or plaintiffs:

"(1) The parties entering into any such agreement or covenant shall promptly inform the court in which the action is pending of the existence of the agreement or covenant and its terms and provisions; and

"(2) If the action is tried before a jury, and a defendant party to the agreement is a witness, the court shall, upon motion of a party, disclose to the jury the existence and content of the agreement or covenant, unless the court finds that such disclosure will create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury.

"The jury disclosure herein required shall be no more than necessary to be sure that the jury understands (1) the essential nature of the agreement, but not including the amount paid, or any contingency, and (2) the possibility that the agreement may bias the testimony of the alleged tortfeasor or tortfeasors who entered into the agreement.

"(b) As used in this section a 'sliding scale recovery agreement' means an agreement or covenant between a plaintiff or plaintiffs and one or more, but not all, alleged tortfeasor defendants, where the agreement limits the liability of the agreeing tortfeasor defendants to an amount which is dependent upon the amount of recovery which the plaintiff is able to recover from the nonagreeing defendant or defendants. This includes, but is not limited to, agreements within the scope of Section 877, and agreements in the form of a loan from the agreeing tortfeaser defendant to the plaintiff or plaintiffs which is repayable in whole or in part from the recovery against the nonagreeing tortfeasor defendant."

Section 878:

"Judgment for contribution may be entered by one tortfeasor judgment debtor against other tortfeasor judgment debtors by motion upon notice. Notice of such motion shall be given to all parties in the action, including the plaintiff or plaintiffs, at least 10 days before the hearing thereon. Such notice shall be accompanied by an affidavit setting forth any information which the moving party may have as to the assets of defendants available for satisfaction of the judgment or claim for contribution."

Section 879:

"If any provision of this title or the application thereof to any person is held invalid, such invalidity shall not affect other provisions or applications of the title which can be given effect without the invalid provision or application and to this end the provisions of this title are declared to be severable."

[6]At the time of the *Dole* decision, the New York contribution statute provided: "Where a money judgment has been recovered jointly against defendants in an action for a personal injury or for property damage, each defendant who has paid more than his pro rata share shall be entitled to contribution from the other defendants with respect to the excess paid over and above his pro rata share; provided, however that no defendant shall be compelled to pay to any other such defendant an amount greater than his own pro rata share of the entire judgment. Recovery may be had in a separate action or a judgment in the original action against a defendant who has appeared may be entered on motion made on notice in the original action." (N.Y.C.P.L.R., former § 1401, repealed N.Y.L. 1974, ch. 742, § 1.)

rata" rather than a comparative fault basis; thus, as is the case in California, under the New York statute a concurrent tortfeasor could obtain contribution only from those tortfeasors whom the plaintiff chose to sue in the same action, and could require such cotortfeasors to pay only a pro rata share of the judgment no matter what the relative culpability of the tortfeasors. The *Dole* court, viewing the statute as simply a partial legislative modification of the harsh common law "no contribution" rule, found nothing in the New York statutory scheme to indicate that the Legislature had intended to preclude judicial extension of the statutory apportionment concept through the adoption of a common law partial indemnification doctrine. (See 331 N.Y.S.2d at pp. 386, 391.)

We believe that a similar conclusion must be reached with respect to the pertinent California legislation. The legislative history of the 1957 contribution statute quite clearly demonstrates that the purpose of the legislation was simply "to lessen the harshness" of the then prevailing common law no contribution rule.[7] Nothing in the legislative history suggests that the Legislature intended by the enactment to preempt the field or to foreclose future judicial developments which further the act's principal purpose of ameliorating the harshness and inequity of the old no contribution rule. Under these circumstances, we see no reason to interpret the legislation as establishing a bar to judicial innovation.

The case of *Green* v. *Superior Court* (1974) 10 Cal.3d 616, 629-631 [111 Cal.Rptr. 704, 517 P.2d 1168], provides an apt analogy. At early common law a landlord owed a tenant no duty to maintain leased residential

---

[7]The 1957 legislation was drafted by the State Bar and was initially introduced in 1955 as Senate Bill No. 412. The State Bar explanation accompanying the bill, which was adopted by the Senate Judiciary Committee, read in pertinent part:

"Under the common law there is no contribution between joint tortfeasors. One of several joint tortfeasors may be forced to pay the whole claim for the damages caused by them yet he may not recover from the others their pro rata share of the claim. California follows this rule. [Citations.] *The purpose of this bill is to lessen the harshness of that doctrine.*

"The ancient basis of the rigid rule against contribution in this type of case is the policy that the law should deny assistance to tortfeasors in adjusting losses among themselves because they are wrongdoers and the law should not aid wrongdoers. But this overemphasizes the supposed penal character of liability in tort; it ignores the general aim of the law for equal distribution of common burdens and of the right of recovery of contribution in various situations, e.g., among co-sureties. It ignores also the fact that most tort liability results from inadvertently caused damage and leads to the punishment of one wrongdoer by permitting another wrongdoer to profit at his expense." (Italics added.) (Third Progress Rep. to the Legis. by the Sen. Interim Jud. Com., 2 Appendix to Sen.J. (1955 Reg. Sess.) p. 52.)

premises in habitable condition throughout the duration of the lease, and in *Green* the landlord argued that because the Legislature had enacted a series of statutes affording tenants a limited "repair and deduct" remedy (Civ. Code, § 1941 et seq.), California courts were not free to evolve a broader, more comprehensive common law warranty of habitability. In *Green* we emphatically rejected the landlord's contention, declaring that "the statutory framework . . . has never been viewed as a curtailment of the growth of the common law in this field." (10 Cal.3d at p. 630.) In like manner we conclude, as did the New York court in *Dole,* that the contribution statutes were not intended to preclude all common law development in this field.

Indeed, there are several specific provisions of the California legislation—not present in the pertinent New York statute—which confirm our conclusion that the legislation should not be interpreted to preclude the recognition of a common law right of comparative indemnity. First, and most significantly, unlike the New York statute, the California contribution provisions specifically preserve the right of indemnity, and indeed, provide that the right of contribution shall be subordinate to such right of indemnity. (Code Civ. Proc., § 875, subd. (f) (quoted in fn. 5, *ante*).) As we have seen, at the time the legislation was enacted, California case law had clearly established that "a right of indemnification may arise as a result of contract *or equitable considerations*" (*Peters* v. *City & County of San Francisco, supra,* 41 Cal.2d 419, 431 (italics added)); consequently, we can only conclude that the Legislature was aware of the equitable indemnity doctrine and desired, by enacting section 875, subdivision (f), to negate any possible inference that the contribution statutes were intended to eliminate such common law indemnity rights. Although the Legislature could obviously not foresee in 1957 that 20 years hence, after the advent of comparative negligence, our court would conclude that equitable considerations justify the adoption of a comparative indemnity rule, this section of the act clearly indicates that the Legislature had no intention of completely withdrawing the allocation of loss issue from judicial purview.

Second, California's contribution statute—again unlike New York's—contains a specific provision which explicitly mandates that the "right of contribution shall be administered in accordance with the principles of equity." (Code Civ. Proc., § 875, subd. (b) (quoted in fn. 5, *ante*).) We need not decide whether this provision would permit our court to interpret the contribution statute itself as providing for comparative rather than per capita contribution (cf. *Lincenberg* v. *Issen, supra,* 318 So.2d 386, 394 (Boyd, J., concurring)), for we think that, at the least, this

provision demonstrates that the Legislature did not conceive of its contribution legislation as a complete and inflexible system for the allocation of loss between multiple tortfeasors. (See, e.g., *Ramirez* v. *Redevelopment Agency* (1970) 4 Cal.App.3d 397, 400-401 [84 Cal.Rptr. 356]; *River Garden Farms, Inc.* v. *Superior Court* (1972) 26 Cal.App.3d 986, 993 [103 Cal.Rptr. 498]; *Rollins* v. *State of California* (1971) 14 Cal.App.3d 160, 165, fn. 8 [92 Cal.Rptr. 251].) By emphasizing that the statutory contribution right is to be administered in accordance with the "principles of equity," principles which the Legislature obviously intended the judiciary to elaborate, the act itself refutes the argument. that the Legislature intended to curtail judicial discretion in apportioning damages among multiple tortfeasors.

In sum, in enacting the 1957 contribution legislation the Legislature did not intend to prevent the judiciary from expanding the common law equitable indemnity doctrine in the manner described above. As already noted, since 1957 the equitable indemnity doctrine has undergone considerable judicial development in this state, and yet it has never been thought that such growth in the common law was barred by the contribution statute. (Cf. *Green* v. *Superior Court, supra,* 10 Cal.3d 616, 629-631.)

Several amici argue alternatively that even if the contribution statute was not intended to preclude the development of a common law comparative indemnity doctrine, our court should decline to adopt such a doctrine because it would assertedly undermine the strong public policy in favor of encouraging settlement of litigation embodied in section 877 of the Code of Civil Procedure, one of the provisions of the current statutory contribution scheme. (Quoted in fn. 5, *ante.*) As amici point out, section 877 creates significant incentives for both tortfeasors and injured plaintiffs to settle lawsuits: the tortfeasor who enters into a good faith settlement is discharged from any liability for contribution to any other tortfeasor, and the plaintiff's ultimate award against any other tortfeasor is diminished only by the actual amount of the settlement rather than by the settling tortfeasor's pro rata share of the judgment. Amici suggest that these incentives will be lost by the recognition of a partial indemnity doctrine.

■ Although section 877 reflects a strong public policy in favor of settlement, this statutory policy does not in any way conflict with the recognition of a common law partial indemnity doctrine but rather can, and should, be preserved as an integral part of the partial indemnity

doctrine that we adopt today. Thus, while we recognize that section 877, by its terms, releases a settling tortfeasor only from liability for contribution and not partial indemnity, we conclude that from a realistic perspective the legislative policy underlying the provision dictates that a tortfeasor who has entered into a "good faith" settlement (see *River Garden Farms, Inc.* v. *Superior Court, supra,* 26 Cal.App.3d 986) with the plaintiff must also be discharged from any claim for partial or comparative indemnity that may be pressed by a concurrent tortfeasor. As the Court of Appeal noted recently in *Stambaugh* v. *Superior Court* (1976) 62 Cal.App.3d 231, 236 [132 Cal.Rptr. 843]: "Few things would be better calculated to frustrate [section 877's] policy, and to discourage settlement of disputed tort claims, than knowledge that such a settlement lacked finality and would lead to further litigation with one's joint tortfeasors, and perhaps further liability." This observation is as applicable in a partial indemnity framework as in the contribution context. Moreover, to preserve the incentive to settle which section 877 provides to injured plaintiffs, we conclude that a plaintiff's recovery from nonsettling tortfeasors should be diminished only by the amount that the plaintiff has actually recovered in a good faith settlement, rather than by an amount measured by the settling tortfeasor's proportionate responsibility for the injury. (See Fleming, *Foreword: Comparative Negligence At Last—By Judicial Choice* (1976) 64 Cal.L.Rev. 239, 258-259.)

 Accordingly, we conclude that Code of Civil Procedure section 875 et seq. do not preclude the development of new common law principles in this area, and we hold that under the common law of this state a concurrent tortfeasor may seek partial indemnity from another concurrent tortfeasor on a comparative fault basis.

5. *Under the allegations of the cross-complaint, AMA may be entitled to obtain partial indemnification from Glen's parents, and thus the trial court, pursuant to Code of Civil Procedure section 428.10 et seq., should have granted AMA leave to file the cross-complaint.*

Having concluded that a concurrent tortfeasor enjoys a common law right to obtain partial indemnification from other concurrent tortfeasors on a comparative fault basis, we must finally determine whether, in the instant case, AMA may properly assert that right by cross-complaint against Glen's parents, who were not named as codefendants in Glen's amended complaint. As we explain, the governing provisions of the Code of Civil Procedure clearly authorize AMA to seek indemnification from a previously unnamed party through such a cross-complaint. Accordingly, we conclude that the trial court erred in denying AMA leave to file its pleading.

As early as 1962, our court concluded that under the then governing provisions of the Code of Civil Procedure, a defendant could file a cross-complaint against a previously unnamed party when the defendant properly alleged that he would be entitled to indemnity from such party should the plaintiff prevail on the original complaint. (*Roylance* v. *Doelger* (1962) 57 Cal.2d 255 [19 Cal.Rptr. 7, 368 P.2d 535].) Although one commentator has suggested that our *Roylance* decision extended the then existing cross-complaint provision beyond its legislatively intended scope (see Friedenthal, *Joinder of Claims, Counterclaims and Cross-Complaints: Suggested Revision of the California Provisions* (1970) 23 Stan.L.Rev. 1, 31-32), when the cross-complaint statutes were completely revised in 1972, the Legislature specifically codified the *Roylance* rule in section 428.10 et seq. of the Code of Civil Procedure.

Section 428.10 provides in relevant part: "A party against whom a cause of action has been asserted . . . may file a cross-complaint setting forth . . . (b) Any cause of action he has against a person alleged to be liable thereon, *whether or not such person is already a party to the action,* if the cause of action asserted in his cross-complaint (1) arises out of the same transaction [or] occurrence . . . as the cause brought against him or (2) asserts a claim, right or interest in the . . . controversy which is the subject of the cause brought against him." (Italics added.)

Section 428.20 reiterates the propriety of filing such a cross-complaint against a previously unnamed party, and section 428.70 explicitly confirms the fact that a cross-complaint may be founded on a claim of total or partial indemnity by defining a "third-party plaintiff" as one who files a cross-complaint claiming "the right to recover all *or part* of any amount for which he may be held liable" on the original complaint. (Italics added.)[8] The history of the legislation leaves no doubt but that

---

[8]Section 428.20 provides in full: "When a person files a cross-complaint as authorized by Section 428.10, he may join any person as a cross-complainant or cross-defendant, whether or not such person is already a party to the action, if, had the cross-complaint been filed as an independent action, the joinder of that party would have been permitted by the statutes governing joinder of parties."

Section 428.70 provides in full:

"(a) As used in this section:

"(1) 'Third-party plaintiff' means a person against whom a cause of action has been asserted in a complaint or cross-complaint, who claims the right to recover all or part of any amounts for which he may be held liable on such cause of action from a third person, and who files a cross-complaint stating such claim as a cause of action against the third person.

"(2) 'Third-party defendant' means the person who is alleged in a cross-complaint filed by a third-party plaintiff to be liable to the third-party plaintiff if the third-party plaintiff is held liable on the claim against him.

these provisions authorize a defendant to file a cross-complaint against a person, not named in the original complaint, from whom he claims he is entitled to indemnity. (See Recommendation and Study Relating to Counterclaims and Cross Complaints, Joinder of Causes of Action and Related Provisions (1970) 10 Cal. Law Revision Com. Rep. pp. 551-555.)

Although real parties in interest claim that the effect of permitting a defendant to bring in parties whom the plaintiff has declined to join will have the undesirable effect of greatly complicating personal injury litigation and will deprive the plaintiff of the asserted "right" to control the size and scope of the proceeding (see, e.g., *Thornton* v. *Luce* (1962) 209 Cal.App.2d 542, 551-552 [26 Cal.Rptr. 393]), as our court observed in *Roylance* (57 Cal.2d at pp. 261-262), to the extent that such claims are legitimate the problem may be partially obviated by the trial court's judicious use of the authority afforded by Code of Civil Procedure section 1048. Section 1048, subdivision (b) currently provides: "The court, in furtherance of convenience or to avoid prejudice, or when separate trials will be conducive to expedition and economy, may order a separate trial of any cause of action, *including a cause of action asserted in a cross-complaint,* or of any separate issue or any number of causes of action or issues, preserving the right of trial by jury required by the Constitution or a statute of this state or of the United States."

In this context, of course, a trial court, in determining whether to sever a comparative indemnity claim, will have to take into consideration the fact that when the plaintiff is alleged to have been partially at fault for the injury, each of the third party defendants will have the right to litigate the question of the plaintiff's proportionate fault for the accident; as a consequence, we recognize that in this context severance may at times not be an attractive alternative. Nonetheless, having already noted that under the comparative negligence doctrine a plaintiff's recovery should be diminished only by that proportion which the plaintiff's negligence bears to that of all tortfeasors (see fn. 2, *ante*), we think it only fair that a defendant who may be jointly and severally liable for all of the plaintiff's damages be permitted to bring other concurrent tortfeasors into the suit. Thus, we conclude that the interaction of the partial indemnity doctrine with California's existing cross-complaint procedures works no undue prejudice to the rights of plaintiffs.

"(b) In addition to the other rights and duties a third-party defendant has under this article, he may, at the time he files his answer to the cross-complaint, file as a separate document a special answer alleging against the third-party plaintiff any defenses which the third-party plaintiff has to such cause of action. The special answer shall be served on the third-party plaintiff and on the person who asserted the cause of action against the third-party plaintiff."

Accordingly, we conclude that under the governing statutory provisions a defendant is generally authorized to file a cross-complaint against a concurrent tortfeasor for partial indemnity on a comparative fault basis, even when such concurrent tortfeasor has not been named a defendant in the original complaint.[9] In the instant case, the allegations of AMA's cross-complaint are sufficient to suggest that Glen's parents' negligence may possibly have been a concurrent cause of Glen's injuries. While we, of course, intimate absolutely no opinion as to the merits of the claim, if it is established that the parents were indeed negligent in supervising their son and that such negligence was a proximate cause of injury, under the governing California common law rule Glen's parents could be held liable for the resulting damages. (See, e.g., *Gibson* v. *Gibson* (1971) 3 Cal.3d 914 [92 Cal.Rptr. 288, 479 P.2d 648].) Thus, we believe that AMA's cross-complaint states a cause of action for comparative indemnity and that the trial court should have permitted its filing.

### 6. *Conclusion*

In *Li* v. *Yellow Cab Co., supra,* this court examined and abandoned the time-worn contributory negligence rule which completely exonerated a negligent defendant whenever an injured plaintiff was partially at fault for the accident, recognizing with Dean Prosser the indefensibility of a doctrine which " 'places upon one party the entire burden of a loss for which two are, by hypothesis, responsible.' " (13 Cal.3d at p. 810, fn. 3 (quoting Prosser, Law of Torts, *supra,* § 67, p. 433).)

In the instant case we have concluded that the force of *Li*'s rationale applies equally to the allocation of responsibility between two or more negligent defendants and requires a modification of this state's traditional all-or-nothing common law equitable indemnity doctrine. Again, we concur with Dean Prosser's observation in a related context that "[t]here is obvious lack of sense and justice in a rule which permits the entire burden of a loss, for which two defendants were . . . unintentionally

---

[9]There are, of course, a number of significant exceptions to this general rule. For example, when an employee is injured in the scope of his employment, Labor Code section 3864 would normally preclude a third party tortfeasor from obtaining indemnification from the employer, even if the employer's negligence was a concurrent cause of the injury. (See *E. B. Wills Co.* v. *Superior Court* (1976) 56 Cal.App.3d 650, 653-655 [128 Cal.Rptr. 541]; cf. *Mize* v. *Atchison, T. & S. F. Ry. Co.* (1975) 46 Cal.App.3d 436, 458-460 [120 Cal.Rptr. 787].)

Similarly, as we have noted above such a partial indemnification claim cannot properly be brought against a concurrent tortfeasor who has entered a good faith settlement with the plaintiff, because permitting such a cross-complaint would obviously undermine the explicit statutory policy to encourage settlements reflected by the provisions of section 877 of the Code of Civil Procedure. (See pp. 603-604, *ante.*)

responsible, to be shouldered onto one alone, . . . while the latter goes scot free." (Prosser, Law of Torts, *supra,* § 50, p. 307.) From the crude all-or-nothing rule of traditional indemnity doctrine, and the similarly inflexible per capita division of the narrowly circumscribed contribution statute, we have progressed to the more refined stage of permitting the jury to apportion liability in accordance with the tortfeasors' comparative fault.

Accordingly, we hold that under the common law equitable indemnity doctrine a concurrent tortfeasor may obtain partial indemnity from cotortfeasors on a comparative fault basis.

Let a peremptory writ of mandate issue directing the trial court (1) to vacate its order denying AMA leave to file its proposed cross-complaint, and (2) to proceed in accordance with the views expressed in this opinion. Each party shall bear its own costs.

Bird, C. J., Mosk, J., Richardson, J., Manuel, J., and Sullivan, J.,* concurred.

**CLARK, J.,** Dissenting.—

I

Repudiating the existing contributory negligence system and adopting a system of comparative negligence, this court in *Li* v. *Yellow Cab Co.* (1975) 13 Cal.3d 804 [119 Cal.Rptr. 858, 532 P.2d 1226, 78 A.L.R.3d 393] repeatedly—like the tolling bell—enunciated the principle that the extent of liability must be governed by the extent of fault. Thus, the court stated, "the extent of fault should govern the extent of liability" (*id.,* at p. 811), "liability for damage will be borne by those whose negligence caused it in direct proportion to their respective fault" (*id.,* at p. 813), and "the fundamental purpose of [the rule of pure comparative negligence] shall be to assign responsibility and liability for damage in direct proportion to the amount of negligence of each of the parties" (*id.,* at p. 829). And in a cacophony of emphasis this court explained that the "basic objection to the doctrine [of contributory negligence]—grounded in the primal concept that in a system in which liability is based on fault, the extent of fault should govern the extent of liability—remains irresistible to reason and all intelligent notions of fairness." (*Id.,* at p. 811.)

---

*Retired Associate Justice of the Supreme Court sitting under assignment by the Chairperson of the Judicial Council.

Now, only three years later, the majority of my colleagues conclude that the *Li* principle is not irresistible after all. Today, in the first decision of this court since *Li* explaining the operation of the *Li* principle, they reject it for almost all cases involving multiple parties.

The majority reject the *Li* principle in two ways. First, they reject it by adopting joint and several liability holding that each defendant—including the marginally negligent one—will be responsible for the loss attributable to his codefendant's negligence. To illustrate, if we assume that the plaintiff is found 30 percent at fault, the first defendant 60 percent, and a second defendant 10 percent, the plaintiff under the majority's decision is entitled to a judgment for 70 percent of the loss against each defendant, and the defendant found only 10 percent at fault may have to pay 70 percent of the loss if his codefendant is unable to respond in damages.

The second way in which the majority reject *Li*'s irresistible principle is by its settlement rules. Under the majority opinion, a good faith settlement releases the settling tortfeasor from further liability, and the "plaintiff's recovery from nonsettling tortfeasors should be diminished only by the amount that the plaintiff has actually recovered in a good faith settlement, rather than by an amount measured by the settling tortfeasor's proportionate responsibility for the injury." (*Ante,* p. 604.)[1] The settlement rules announced today may turn *Li*'s principle upside down—the extent of dollar liability may end up in inverse relation to fault.

Whereas the joint and several liability rules violate the *Li* principle when one or more defendants are absent or unable to respond in damages, the settlement rules will ordinarily preclude effecting the majority's principle in cases when all defendants are involved in the

---

[1]Although one of the most important matters determined by today's decision, the issue of pro rata reduction or dollar amount reduction was barely mentioned and the relative merits of the two systems were not briefed or argued by the parties or by any of the numerous amici. The overwhelming weight of authority—contrary to the majority—is for pro rata reduction rather than settlement amount reduction. (Ark. Stats. Ann., § 34-1005; Hawaii Rev.Laws § 663-15; *Nebben* v. *Kosmalski* (1976) 307 Minn. 211 [239 N.W.2d 234, 236]; *Theobald* v. *Angeles* (1965) 44 N.J. 228 [208 A.2d 129, 131]; *Rogers* v. *Spady* (1977) 147 N.J.Super. 274 [371 A.2d 285, 287]; N.Y.Gen.Obl.Law, § 15-108; R.I. Gen.Laws (1956) § 10-6-8; S.D.Codified Laws 15-8-18; Tex.Rev.Civ.Stat., art. 2212a, § 2(e); Utah Code 78-27-43; *Gomes* v. *Brodhurst* (3d Cir. 1967) 394 F.2d 465; *Pierringer* v. *Hoger* (1963) 21 Wis.2d 182 [124 N.W.2d 106]; Wyo.Stat. Ann. § 1-7.6; but cf. Fla.Stat.Ann. § 768.31; Mass.Laws Ann., ch. 231B, § 4.) Although I believe it is improper for the court to reach such an important issue without the aid of counsel, I am compelled to discuss the problem because the majority has determined it.

litigation and are solvent. To return to my 30-60-10 illustration and further assuming both defendants are solvent, the plaintiff is ordinarily eager to settle quickly to avoid the long delay incident to trial. Further, he will be willing to settle with either defendant because under the majority's suggested rules, he may then pursue the remaining defendant for the balance of the recoverable loss (70 percent) irrespective whether the remaining defendant was 10 percent at fault or 60 percent at fault. The defendants' settlement postures will differ substantially. Realizing the plaintiff is eager for quick recovery and is capable of pursuing the codefendant, the defendant 60 percent liable for the loss will be prompted to offer a sum substantially below his share of fault, probably paying 20 to 40 percent of the loss. The defendant only 10 percent at fault will be opposed to such settlement, wishing to limit his liability. To compete with his codefendant in settlement offers he will be required to offer substantially in excess of his 10 percent share of the loss, again frustrating the *Li* principle that the extent of liability should be governed by the extent of fault. Should he fail to settle, the 10 percent at fault defendant runs the risk that his codefendant will settle early for perhaps half of his own liability, while the lesser negligent person must eventually pay the remainder, not only frustrating the *Li* principle but turning it upside down. In any event, it is extremely unlikely he can settle for his 10 percent share.[2]

---

[2] In addition, the policy in favor of settlement will be frustrated by the majority's rule that the plaintiff's recovery against nonsettling tortfeasors should be diminished only by the amount recovered in a good faith settlement rather than by settling tortfeasor's proportionate responsibility. (*Ante,* p. 604.) As the majority recognize: " 'Few things would be better calculated to frustrate [section 877's] policy, and to discourage settlement of disputed tort claims, than knowledge that such a settlement lacked finality and would lead to further litigation with one's joint tortfeasors, and perhaps further liability.' " (*Id.*) Settlement by one tortfeasor is not going to compel the other tortfeasor to withdraw his cross-complaint for total or partial indemnity. Rather there will be a claim of bad faith because if the jury awards the plaintiff all of the damages sought and concludes that the settling tortfeasor should bear the lion's share of the responsibility for the laws, the settling tortfeasor would have escaped for a small fraction of his actual liability. This alone, although not determinative, would indicate bad faith. (*River Garden Farms, Inc.* v. *Superior Court* (1973) 26 Cal.App.3d 986, 997 [103 Cal.Rptr. 498] ("price is the immediate signal for the inquiry into good faith").)

Obviously, in most cases the jury will not award plaintiff all of the damages sought and will not conclude the settling tortfeasor should have borne the lion's share. But because prior to trial these matters are necessarily uncertain and the possibility of establishing bad faith exists, the nonsettling tortfeasor's counsel must continue to maintain his cross-complaint for total and partial indemnity. (Cf. *Smith* v. *Lewis* (1975) 13 Cal.3d 349, 360 [118 Cal.Rptr. 621, 530 P.2d 589, 78 A.L.R.3d 231] (failure to pursue arguable claims may constitute malpractice).) Aware that his settlement will not ordinarily prevent his participating in the litigation of the issues of damages and relative fault and that he might be held liable for further damages, a defendant contemplating settlement will rarely do so alone.

The foregoing demonstrates that under the majority's joint and several liability and settlement rules, only rarely will the *Li* principle be carried out in multi-party litigation. The principle will be frustrated if one or more defendants are unavailable, insolvent, or have settled. Prior to *Li*, the overwhelming majority of accident cases were settled in whole or in part, and assuming this practice continues, the *Li* principle will not be realized in those cases. In a substantial number of the remaining cases it can be expected that one of the tortfeasors will not be able to respond in damages, again frustrating the *Li* principle. In sum, although the majority devote approximately half of their opinion to asserted maintenance of the *Li* principle (pts. 3, 4, and 5), in only a very small number of multiple party cases will the loss be shared in accordance with that principle.

Attempting to justify their repudiation of the *Li* principle in favor of joint and several liability, the majority suggest three rationales. First, we are told that the feasibility of apportioning fault on a comparative basis does not "render an indivisible injury 'divisible,'" each defendant's negligence remaining a proximate cause of the entire indivisible injury. (*Ante,* p. 588.) The argument proves too much. Plaintiff negligence is also a proximate cause of the entire indivisible injury, and the argument, if meritorious, would warrant repudiation of *Li* not only in the multiple party case but in all cases.

The second rationale of the majority lies in two parts. First, we are told that after *Li* there is no reason to assume that plaintiffs will "invariably" be guilty of negligence. (*Ante,* p. 589.) Obviously this is true. The basis of joint and several liability prior to *Li* was that between an innocent plaintiff and two or more negligent defendants, it was proper to hold the defendants jointly and severally liable. The innocent plaintiff should not suffer as against a wrongdoing defendant. (*Ante,* p. 588.) (*Finnegan v. Royal Realty Co.* (1950) 35 Cal.2d 409, 433-434 [218 P.2d 17].) Accordingly, it is not unreasonable to reject the *Li* principle when we are comparing the plaintiff's innocence and defendants' negligence. But the issue presented by this case is whether joint and several liability shall be extended to *Li* cases, cases where the plaintiff *by definition* is negligent. While we cannot know whether a plaintiff will be found negligent until trial, we also cannot know whether any given defendant will be found at fault until trial. Since liability is not to be determined until after trial, there is no reason not to deal with the real issue before us whether joint and several liability should be applied in cases where the plaintiff is

found negligent—i.e., cases where by definition the plaintiff is "invariably" found negligent.

As a second part of the second rationale for joint and several liability we are told that a plaintiff's culpability is not equivalent to that of a defendant. This is obviously true—this is what *Li* is all about. The plaintiff may have been driving 50 miles in excess of the speed limit while the defendants may have been driving 10 miles in excess. The converse may also be true. But the differences warrant departure from the *Li* principle in toto or not at all.

The majority's third rationale for rejecting the *Li* principle is an asserted public policy for fully compensating accident victims. The majority state that joint and several liability "recognizes that fairness dictates that the 'wronged party should not be deprived of his right to redress,' but that '[t]he wrongdoers should be left to work out between themselves any apportionment.' (*Summers* v. *Tice* (1948) 33 Cal.2d 80, 88 [199 P.2d 1, 5 A.L.R.2d 91].)" (*Ante*, p. 590.) The quoted language is not helpful to the majority when the plaintiff is also negligent because he is himself a wrongdoer.

Until today neither policy nor law called for fully compensating the negligent plaintiff. Prior to *Li,* the negligent plaintiff was denied all recovery under the contributory negligence doctrine—the policy reflected being directly contrary to that asserted today. *Li,* of course, repudiated that doctrine replacing it with a policy permitting compensation of the negligent accident victim but only on the basis of comparative fault. Moreover, *Li* cannot be twisted to establish a public policy requiring rejection of its own irresistible principle. In sum, the majority are establishing a new policy both contrary to that existing prior to *Li* and going further than that reflected by the comparative principle enunciated in *Li.*

Conceivably, such a new public policy departing from intelligent notions of fairness may be warranted but, if so, its establishment should be left for the Legislature. Before going beyond *Li*'s principle "irresistible to reason and all intelligent notions of fairness" (13 Cal.3d at p. 811), a full evaluation should be made of society's compensation to accident victims through our tort system in comparison to all other means used by society to compensate victims. A study should include such matters as the relative workings of the liability insurance system in providing benefits, disability insurance and employer benefits, medical insurance,

workers' compensation, insurance against uninsured defendants, Medicare, Medi-Cal and the welfare system. Reconsideration of the collateral source rule would also be required before adoption of a public policy going beyond intelligent notions of fairness. The evidence gathering and hearings necessary for the requisite study are within the capabilities of the Legislature; this court is institutionally incapable of undertaking it.

The majority rely on decisions from Mississippi, New York, Wisconsin, and Georgia for the proposition that courts have retained joint and several liability under comparative negligence. (*Ante*, p. 591.) In the cases cited from the first two jurisdictions, it does not appear that the plaintiff was negligent under the facts or that the court in adhering to joint and several liability was considering cases where the plaintiff was negligent. Thus, those cases stand for nothing more than application of joint and several liability when a plaintiff is innocent and the defendants are guilty, the traditional common law application. The third jurisdiction, Wisconsin, is not a pure comparative negligence jurisdiction. Rather, the negligent plaintiff can recover only if his " 'negligence was not as great as the negligence of the person against whom recovery is sought.' " (*Chille v. Howell* (1967) 34 Wis.2d 491 [149 N.W.2d 600, 604].) Because of the limitation on recovery by negligent plaintiffs in Wisconsin, it may be justifiable to apply joint and several liability by analogy to the common law principle that as between an innocent plaintiff and any negligent defendant, the entire loss shall fall on the negligent actor. Obviously, such justification is not available in a pure comparative jurisdiction like California. Only the Georgia case is in point.

In any event as pointed out by Justice Thompson in the opinion and chart prepared in the Court of Appeal in this case, several jurisdictions adopting comparative fault have abolished joint and several liability.[3]

In my view the majority's effort to resist the irresistible fails. They have furnished no substantial reason for refusing to apply the *Li* principle to multi-party litigation.

## II

Adherence to the *Li* principle that the extent of liability is governed by the extent of fault requires that only a limited form of joint and several

[3]It has been suggested that statutes repudiating joint and several liability in comparative negligence cases are entitled to little, if any, weight in comparison to judicial opinions on the issue. However, in a democracy the laws enacted by the people's elected representatives are entitled to great weight.

liability be retained in cases where the plaintiff is negligent.[4] The issue of joint and several liability presents the problem whether the plaintiff or the solvent defendants should bear the portion of the loss attributable to unknown defendants or defendants who will not respond in damages due to lack of funds.

Consistent with the *Li* principle—the extent of liability is governed by the extent of fault—the loss attributable to the inability of one defendant to respond in damages should be apportioned between the negligent plaintiff and the solvent negligent defendant in relation to their fault. (Fleming, *Foreword: Comparative Negligence At Last—By Judicial Choice* (1976) 64 Cal.L.Rev. 239, 251-252, 257-258.) Returning to my 30-60-10 illustration, if the 60 percent at fault defendant is unable to respond, the 30 percent at fault plaintiff should be permitted to recover 25 percent of the entire loss from the 10 percent at fault solvent defendant based on the 3 to 1 ratio of fault between them. (The solvent defendant would have added to his 10 percent liability one-fourth of the 60 percent or 15 percent to reach the 25 percent figure.) To the extent that anything is recovered from the 60 percent at fault defendant, the money should be apportioned on the basis of the 3 to 1 ratio. The system is based on simple mechanical calculations from the jury findings.

Placing the entire loss attributable to the insolvent defendant solely on the negligent plaintiff or solely on the solvent negligent defendant is not only contrary to the *Li* principle, but also undermines the entire system of comparative fault. If the portion attributable to the insolvent defendant is placed upon the negligent plaintiff, the solvent defendant will attempt to reduce his liability by magnifying the fault of the insolvent defendant. Should the insolvent's portion be placed solely upon the solvent defendant—as done by the majority's application of joint and several liability—the plaintiff will have an incentive to magnify the fault of the insolvent defendant.[5] Because the insolvent—and

---

[4]When the plaintiff is free of fault he is entitled to a joint and several judgment against each defendant in accordance with common law rule. The *Li* principle is inapplicable because there is simply no plaintiff fault for comparing with defendants' fault.

In addition, when one defendant is held liable for the acts of another on the basis of principles of vicarious liability, there should be no apportionment of liability because by definition one is liable for the acts of the other. (*Ante,* p. 587.) Apportionment between defendants should be denied even if the plaintiff is negligent, and in determining relative fault of plaintiff and defendants, the single negligent act for which both defendants are responsible should not be counted twice.

[5]To illustrate, if plaintiff and the solvent defendant are equally at fault, the amount to be recovered will depend on the extent of fault of the insolvent defendant. If the

therefore disinterested—defendant will usually not be present at trial to defend himself, any semblance to comparative fault will be destroyed.

Similarly, settlement rules should also reflect the *Li* principle. When a defendant settles, he should be deemed to have settled his share of the total liability and the pleadings and releases should so reflect. The nonsettling defendant should be liable only for the portion of the loss attributable to him—deducting from the total loss the amount attributable to the plaintiff's negligence[6] and the amount attributable to the settling defendant's negligence. This rule adopted by Wisconsin (*Pierringer* v. *Hoger* (1963) 21 Wis.2d 182 [124 N.W.2d 106, 111-112]), would force a plaintiff to demand settlements reasonably commensurate to the fault of the settling defendant because he will no longer be able to settle quickly and cheaply, then holding the remaining defendants for part of his codefendant's share of the loss. Granted, the nonsettling defendant will have an incentive to magnify the fault of the settling defendant, but it is not unfair to place the burden of defending the settling defendant upon the plaintiff for three reasons: He is the one who chose to settle, the settlement has eliminated any right of contribution or partial indemnity of the nonsettling defendant, and the plaintiff in obtaining his settlement may secure the cooperation of the settling defendant for the later trial.

### III

"[I]rresistible to reason and all intelligent notions of fairness" (13 Cal.3d 804, 811), this court created a policy three years ago the majority today cavalierly reject without real explanation. Their attempted rationale for rejection of the *Li* principle insofar as it is based on a newly discovered public policy is entitled to little weight. The public has no such policy and any attack on the principle based on logic or abstract notions of fairness fail. The principle is transparently irresistible in the abstract.

If not applied across the board the *Li* principle should be abandoned. The reason for abandonment applies not only to multi-party cases but also to two-party cases, warranting total repudiation of the principle, not merely the majority's partial rejection.

---

insolvent defendant is 80 percent at fault, plaintiff will recover 90 percent of his loss but if the insolvent is only 10 percent at fault, recovery will be limited to 55 percent of the loss.

[6]Existing rules should be continued as to nonnegligent plaintiffs.

While logically reasonable and fair in the abstract, the *Li* principle is generally unworkable, producing unpredictable and inconsistent results. Implementation of the principle requires judgment beyond the ability of human judges and juries. The point is easily illustrated. If the first party to an accident drove 10 miles in excess of the speed limit, the second 50 miles in excess, it is clear that the second should suffer the lion's share of the loss. But should he pay 55 percent of the loss, 95 percent or something in between? That question cannot be answered with any precision, and human beings will not answer it consistently. Yet that is the easiest question presented in comparing fault because we are dealing only with apples. When we add oranges to the comparison, there are no guidelines. If the first driver also was driving under the influence of Jack Daniels, reasonable judges and juries will disagree as to who shall bear the lion's share of the loss, much less the percentages. Finally, when the case is pure apples and oranges—one party speeds, the other runs a stop signal—there is no guide post, much less guidelines, and acting in furtherance of the *Li* principle, reasonable judges and juries can be expected to come up with radically different evaluations.[7]

In short, the pure comparative fault system adopted by *Li* not only invites but demands arbitrary determinations by judges and juries, turning them free to allocate the loss as their sympathies direct. We may expect that allocation of the loss will be based upon the parties' appearance and personality and the abilities of their respective counsel. The system is a nonlaw system. Furthermore, prior to *Li* our tort system of liability was condemned because it was so inefficient in transferring the liability insurance premium to the accident victim (e.g., Conard et al., Automobile Accident Costs and Payments (1964) pp. 58-61). The complexities and unpredictability of the *Li* system can only make the system even more inefficient.

I do not suggest return to the old contributory negligence system. The true criticism of that system remains valid: one party should not be required to bear a loss which by definition two have caused. However, in departing from the old system of contributory negligence numerous approaches are open, but the Legislature rather than this court is the

---

[7]In the instant case, plaintiff alleges defendants negligently conducted a motorcycle race. Defendant American Motorcycle Association alleges that plaintiff was negligent in causing the accident and that plaintiff's parents negligently failed to supervise their minor child. Assuming that both plaintiff and defendant are successful in proving their allegations, the division of the loss between plaintiff, defendant, and the parents will require arbitrary allocation.

proper institution in a democratic society to choose the course. To accommodate the true criticism, for example, it might be proper to take the position that a negligent plaintiff forfeits part—but not all—of his recovery in a percentage fixed by the Legislature. A fixed percentage approach would eliminate the impossible task of comparing apples and oranges placed upon the trier of fact by *Li* and would provide the consistency, certainty and predictability which foster compromise and settlement. Although the percentage would be arbitrary, the allocation of loss as demonstrated above is necessarily arbitrary under the present system.

In my dissenting opinion in *Li* I pointed out: "[T]he Legislature is the branch best able to effect transition from contributory to comparative or some other doctrine of negligence. Numerous and differing negligence systems have been urged over the years, yet there remains widespread disagreement among both the commentators and the states as to which one is best. (See Schwartz, Comparative Negligence (1974) Appen. A, pp. 367-369 and § 21.3, fn. 40, pp. 341-342, and authorities cited therein.) This court is not an investigatory body, and we lack the means of fairly appraising the merits of these competing systems. Constrained by settled rules of judicial review, we must consider only matters within the record or susceptible to judicial notice. That this court is inadequate to the task of carefully selecting the best replacement system is reflected in the majority's summary manner of eliminating from consideration *all but two* of the many competing proposals—including models adopted by some of our sister states." (Fn. omitted; 13 Cal.3d at pp. 833-834.)

Again, it must be urged that this is a subject to which the Legislature should address itself. Not only are there a number of different approaches to plaintiff negligence in our sister states but recent years have spawned numerous studies of the problem from the societal point of view. (E.g., Cal. Citizens Com. on Tort Reform, Righting the Liability Balance (Sept. 1977).) The two most modern trends of compensating accident victims run in directly contrary approaches—the nonfault approach where negligence may be ignored and the comparative fault approach where the quantum of negligence is to be meticulously divided among the parties. No area of the law calls out more for a clear policy established by democratically elected representatives.

Petitioner's application for a rehearing was denied March 16, 1978, and the opinions were modified to read as printed above. Clark, J., was of the opinion that the application should be granted.