[Civ. No. 12481. Third Dist. Dec. 10, 1971.]

KERR CHEMICALS, INC. et al., Cross-complainants and Respondents, v. CROWN CORK & SEAL CO., INC., Cross-complainant and Appellant.

**COUNSEL**

McLaughlin & McCarthy, Thomas Poggi and Richard G. Logan, for Cross-complainant and Appellant.

Fitzwilliam, Memering, Stumbos & DeMers and Louis A. DeMers for Cross-complainants and Respondents.

## OPINION

**PIERCE, J.**[*]—Plaintiff DeYoung suffered the loss of an eye and other serious injuries as a result of the explosion of a can of aerosol spray paint. The explosion occurred while he was shaking the can preparatory to painting a refrigerator in the course of his employment by defendant Baker, doing business as Associated Refrigerator & Equipment Co. The can in which the paint had been contained was manufactured by cross-complainant (here), Crown Cork & Seal Co., and had been sold as one of a lot of 120,000 to cross-defendant, Kerr Chemicals, Inc. Kerr filled it with a mixture of paint and Freon gas plus an agitator and a valve. It was one of a number of such cans sold by Kerr to Associated. DeYoung sued Crown and Kerr for his injuries. Associated, originally a defendant, was dismissed on the last day of the original trial. Plaintiff received a verdict and judgment for $150,000 against both remaining defendants. The net judgment was paid, Crown and Kerr each contributing one-half. Before that judgment, however, and in the original action, Crown and Kerr had cross-complained against each other. After the original judgment, the action proceeded on the cross-complaints. Kerr sought to recover from Crown, upon the theory of implied indemnity, the portion of the DeYoung judgment which it had paid (plus litigation expenses). It claimed that Crown's liability to DeYoung was primary and that Kerr's was secondary. That claim was tried to the court. At the trial of the cross-actions the parties adopted the evidence at the trial of the original action. The trial court accepted Kerr's theory of implied indemnity, Crown appeals. ▮ We shall reverse for the reason that, although there is evidence in the record providing a basis for a finding on the essential issue whether Kerr shared primary liability for the accident, the trial court failed to find on that issue. Additional facts will be stated during the discussion below.

### Crown is a Primary Tortfeasor

At the outset, we do not have the problem of determining Crown's status as a primary tortfeasor. Substantial evidence at the trial proved that the bottom of the can which exploded was defectively made, containing thinner metal than that intended to be used for spray paint, and that that was the cause of the explosion.

---

[*]Retired Presiding Justice of the Court of Appeal sitting under assignment by the Chairman of the Judicial Council.

### The Applicability of the Doctrine of
### Implied Indemnity in Favor of
### Kerr Chemicals

On November 30, 1971, this court filed *Ford Motor Co. v. Robert J. Poeschl, Inc., ante,* p. 694 [98 Cal.Rptr. 702], which asserts all principles and rules of law necessary to the disposition of the case at bench. ■ There, as here, the parties had entered into no contract to indemnify and the decision hinged upon the principles of implied indemnity "which permits one of two tortfeasors to shift the entire loss to the other when, without active fault on the claimant's part, he has been compelled by reason of some legal obligation to pay damages occasioned by the immediate fault of the other." (*Ante,* pp. 694, 696.) The decision points out that although some of the California cases speak of "active" as compared with "passive" fault as affecting application of the doctrine, this court prefers the description in *Builders Supply Co. v. McCabe,* 366 Pa. 322 [77 A.2d 368 at pages 370-371, 24 A.L.R.2d 319] (cited in a number of California cases, see fn. 1 of *Ford, supra*): ■ ■ "The right of *indemnity* rests upon a difference between the primary and secondary liability of two persons each of whom is made responsible by the law to an injured party. . . . The difference between primary and secondary liability is not based on a difference in *degrees* of negligence or on any doctrine of *comparative* negligence—a doctrine which, indeed, is not recognized by the common law . . . . It depends on a difference in the *character* or *kind* of the wrongs which cause the injury and in the nature of the legal obligation owed by each of the wrongdoers to the injured person. . . . But the important point to be noted in all the cases is that secondary as distinguished from primary liability rests upon a fault that is imputed or constructive only, being based on some legal relation between the parties, or arising from some positive rule of common or statutory law or because of a failure to discover or correct a defect or remedy a dangerous condition caused by the act of the one primarily responsible."

Attempts to state the dividing line between primary and secondary liability are frequently difficult at best. Explanation (in *Builders Supply Co. v. McCabe, supra*) in terms of character or kind as distinct from degree is helpful. An article in 41 Southern California Law Review 728, 744 (cited in *Ford, supra,* at p. 697) is even more helpful. It explores the rationale adopted by the courts and it states (on p. 746): "Thus, deterrence seems to be the base of decisions on indemnity. Indemnity is used to allocate loss fully upon a single party in cases where there is extreme disproportion in the deterability of each tortfeasor's conduct. Both the nature of the liability imposed (*e.g.,* unreasonable conduct as opposed to participation in ultra-

hazardous activity, or failure to inspect) and the relative conduct of each party (*e.g.*, liability through respondeat superior, but with actual knowledge of the agent's prior unreasonable conduct) are considered. Another influence in indemnity decisions is a feeling about community moral values. A significantly different reaction to the conduct of the parties increases the chance that indemnity will be granted."

██ A recent case, *Pearson Ford Co.* v. *Ford Motor Co.* (1969) 273 Cal.App.2d 269 [78 Cal.Rptr. 279] (hg. den.)—also cited in our case, *Ford, supra,* at page 698, for the proposition that "the issue whether the claimant's conduct precludes [or does not preclude] indemnity is [usually] a fact question for the jury and becomes one of law only when the result is clear and undisputable"—is perhaps closer on its facts to this case than any other California case. In *Pearson* a brake was defective and an accident occurred because of a missing keeper pin which allowed the brake assembly to fall apart. The car had been taken to the dealer to repair a defective brake light. The dealer's employees did not discover that the keeper pin had sheared off. In the trial court the dealer obtained a judgment for complete indemnification from the car's manufacturer. The theory of the trial court had been that in the principal action the dealer's only liability was under the manufacturer and retailer's strict liability rule as established in *Vandermark* v. *Ford Motor Co.* (1964) 61 Cal.2d 256 [37 Cal.Rptr. 896, 391 P.2d 168]. The judgment was reversed on appeal. The appellate court held that the question of the liability of Pearson Ford was one of active culpability and was thus a question of fact. If a jury should determine that Pearson's mechanics should have noticed the missing keeper pin during their work of repair, then active or primary negligence would be a proximate contributing cause of the accident and there should be contribution between the tortfeasors on the joint judgment against them in the main action. *Cahill Bros., Inc.* v. *Clementina Co.*, 208 Cal.App.2d 367 [25 Cal. Rptr. 301], was extensively quoted from. (It was also cited in our case *Ford Motor Co.* v. *Robert J. Poeschl, Inc., supra,* fn. 1.) ██ A quotation therefrom is appropriate: ". . . The crux of the inquiry is participation in some manner by the person seeking indemnity in the conduct or omission which caused the injury beyond mere failure to perform the duty imposed upon him by law [i.e., as a general contractor]. [Citations.] The thrust of these cases is that if the person seeking indemnity personally participates in an affirmative act of negligence, or is physically connected with an act or omission by knowledge or acquiescence in it on his part, or fails to perform some duty in connection with the omission which he may have undertaken by virtue of his agreement, he is deprived of the right of indemnity." (Pp. 381-382.)

Justice Molinari of the Court of Appeal, First District, was the author

of the opinion in *Cahill Bros., supra.* He is also the author of an article in 8 Santa Clara Lawyer 159 et seq. The latter, although written before *Pearson Ford Co., supra,* is an excellent compendium of the cases to the date of its composition (1968). It will obviate the necessity of repetition by this court of cases cited therein (or, for that matter, in *Ford Motor Co., supra*). Mention of one, however, will bear repeating to point up the discussion herein, viz., *City of Sausalito* v. *Ryan* (Cal.App. 1968) 65 Cal.Rptr. 391, which asserted the rule that in California indemnity may be predicated upon the basis of the disparity in the contrasted gravity of fault. A hearing was granted by the Supreme Court, but the appeal was dismissed at the request of the parties. ▆ Resolution of the question of implied indemnity on the basis of comparative primary liability would be foreign to California law generally, and in our view would not be a desirable rule of decision. As stated in 41 Southern California Law Review 728, *supra,* at page 747: ". . . Given the difficulties and imprecisions of tort law as a whole, as well as the competency of twelve jurors . . . [the apportionment in percentages] is hardly meaningful. It is impossible to make such fine determinations about either fault or deterability. What appears to be a highly sophisticated system of discrimination between tortfeasors, may well be an entirely arbitrary division of loss, garbed in decimal form." We may add that it appears to us also to be in discord with the legislative scheme in the joint tortfeasor contribution statute. (Code Civ. Proc., § 875 et seq.) We hold that that is not a "right of contribution . . . administered in accordance with the principles of equity." (Code Civ. Proc., § 875, subd. (b).)

▆ There was substantial evidence that Kerr *may* have been guilty of negligence which was not merely imputed but which constituted a breach of duty owed by Kerr under primary common law rules of negligence and which proximately contributed to the injury of plaintiff DeYoung. Under such circumstances, reason dictates that Crown and Kerr should each bear one-half the loss—in short, under the facts of this case, they should be left in the position they were when this litigation between them started.

The Bureau of Explosives of the Interstate Commerce Commission commands that every manufacturer of aerosol paints must, before marketing its completed product, subject the cans of paint to a water bath test. This is accomplished as a part of the assembly line process by which the completed product is manufactured. The "water bath" is accomplished by immersing the finished product (i.e., the can with paint, gas, agitator and valve assembly) in water heated to 160 degrees Fahrenheit for a period of three minutes. When subjected to such test, the internal temperature of the normal can and its contents will reach 130 degrees Fahrenheit. There was also evidence that shaking the can would have no effect either upon internal

temperature or pressure of the can. The evidence was not without conflict but, if believed, the conclusion follows that the can would have exploded in the water bath and not in DeYoung's hand. This, in turn, would have left it inferable that the temperature of the water in the bath did not reach 160 degrees Fahrenheit, or that the cans of this particular lot had not been left in the bath for three minutes, or that for some reason this particular can had not been immersed. Assuming such facts, it was primary negligence to place this product on the market.

The trial judge seems to have drawn this conclusion. In his memorandum opinion he stated: ". . . It was shown that . . . [Kerr] routinely inspected the cans in the factory during the filling process by a water bath designed to raise internal pressure after filling so that if there were a defect in the can it would be detected. From the evidence, inference could be drawn that the particular can either was not tested or that the test was improperly done because it should have ruptured at the water bath temperature if it ruptured in the hands of the plaintiff at room temperature and with minimum agitation of it."

The trial court, nevertheless, made no finding on this question because, as stated, it was of the opinion that implied indemnity was, as a matter of law, the rule to be applied in this case.

■ The parties had stipulated that the trial court could determine the issues involved on the record before the jury in the principal action. That stipulation, however, was made under the assumption that the trial judge (no longer sitting on the bench) who had presided at the jury trial would decide the indemnity action. ■ Normally, where facts are disputed, this court is not a fact-finding body. (*Weisz Trucking Co.* v. *Emil R. Wohl Constr.* (1970) 13 Cal.App.3d 256 [91 Cal.Rptr. 489].

Judgment is reversed. ■ In fairness, the stipulation under the circumstances described should no longer be binding. Unless the parties, Crown and Kerr, stipulate otherwise, the action must be retried on the issues remaining.

Friedman, Acting P. J., and Regan, J., concurred.

A petition for a rehearing was denied December 23, 1971, and respondents' petition for a hearing by the Supreme Court was denied February 3, 1972.