[Civ. No. 16906. Third Dist. Sept. 28, 1979.]

ROY C. HORNE et al., Plaintiffs, and Respondents, v.
JORDAN N. PECKHAM, Defendant, Cross-complainant and
Appellant;
THOMAS J. McINTOSH et al., Cross-defendants and Respondents.

COUNSEL

Price, Burness, Price & Davis, R. E. Burness and Bruce N. Grinnell for Defendant, Cross-complainant and Appellant.

Richard F. Mills, Mills & Westerberg and Robert C. Schleh for Plaintiffs and Respondents.

Boornazian, King & Schulze, Boornazian, King, Jensen & Garthe, Richard M. Schulze and George King for Cross-defendants and Respondents.

OPINION

**PARAS, Acting P. J.**—Defendant, an attorney, appeals from a judgment entered after a jury awarded damages of $64,983.31 against him for legal malpractice in connection with the drafting of a "Clifford Trust" for plaintiffs Roy C. Horne (Horne) and Doris G. Horne, husband and wife. He contends that the judgment should be reversed or in the alternative that another attorney, Thomas J. McIntosh, upon whom he relied for advice, should indemnify him.

In 1960, Horne obtained a patent for processing low grade wood into defect-free material known as "Perfect Plank Plus." In 1962, he founded a business called "Perfect Plank," and in 1967 began to produce the patented product. The business was incorporated in 1965, with the Hornes as sole shareholders. Horne anticipated that production of the product might generate substantial income, so he became interested when he read in a newsletter of the tax advantages of a so-called "Clifford Trust." On July 18, 1967, on the recommendation of Herbert McClanahan, his accountant, he went to defendant and asked him to prepare such a trust, Horne's three sons to be its beneficiaries.

Defendant testified he told Horne "... that I had no knowledge of tax matters. I had no expertise in tax matters; that if somebody else could figure out what needed to be done, I could draft the documents." He

said that McClanahan had provided him with "... a couple of pages of translucencies...governing Clifford Trusts," and ne also consulted the two-volume annual set of American Jurisprudence on federal taxation, which included a discussion of Clifford Trusts; he otherwise relied on McClanahan's judgment.

The original plan was to put the patent, which had 10 more years of life, into the trust. However, on October 11, 1967, Horne told defendant he no longer desired this and asked "...if it wouldn't be just as good to put in a [nonexclusive] [l]icense..." of the patent rights. Horne testified that he preferred not to put the patent itself into the trust, because the substantial royalties from it would result in more money that should properly be given to his sons.

Defendant testified he told Horne that "...I didn't know whether...[a license] would be just as good or not, but that we were having a high-priced tax expert come up here—like the following day—who was undoubtedly going to charge plenty of money for the consultation, and that we should ask him on that point." The tax expert to whom defendant referred was McIntosh, an attorney from Albany, California, who had been recommended by McClanahan as an expert in deferred compensation and profit-sharing plans. Such plans for Horne's company were to be discussed at a meeting with McIntosh arranged by McClanahan and scheduled for the next day, October 12. Unknown to defendant, McIntosh had been licensed to practice law less than a year, although he was also a certified public accountant and had worked for two and one-half or three years as a tax accountant.

The meeting of October 12 was attended by Horne, his wife, one son, McClanahan, defendant, and McIntosh. Defendant testified that he asked McIntosh whether it would be just as effective to transfer a license agreement into the contemplated trust as the patent itself, and received an affirmative answer. He further testified that Horne had been talking of a nonexclusive license during the meeting, thus McIntosh should have been aware that such a license was contemplated. However, defendant also testified that no one told McIntosh that the contemplated license would have a five-year duration.

Horne testified that he thought the subject of license versus patent arose at that meeting, but he had no independent recollection of it. McIntosh testified that even though at his deposition he thought he recalled such a discussion, he did not recall it at trial.

Sometime after the meeting, defendant drafted the final documents and sent them to McClanahan for approval. He had no further discussions or correspondence with McIntosh. The documents were signed in November 1967, although dated February 1, 1967, the date production of the product began. The first document was an irrevocable trust agreement between the Hornes as trustors and McClanahan, defendant, and one Bill Ryan as trustees for the Horne's three sons, to terminate in twelve years (1979). The second was a license agreement between Horne and Perfect Plank, granting the corporation a license to produce the patented product for two years with an option to renew for an additional three years, in return for royalty payments determined by production; inter alia, the agreement stated "This license is not exclusive. Licensor retains the right to issue other licenses of the same patent to any other parties whatsoever." The third document was an assignment to the trustees by Horne of Horne's rights under the license agreement thus furnishing the trust with a corpus.

The license royalties were paid into the trust until 1970 when the Internal Revenue Service (IRS) audited Horne's tax returns. Horne was notified of the audit by mail sometime prior to March 18, 1970, and knew within a few days thereafter of a challenge to the favorable tax aspect of the trust. In August 1970, the IRS assessed a deficiency on the ground that the trust did not transfer tax liability for the licensor's income to the beneficiaries. Horne hired McIntosh to contest the assessment.

After losing at the first administrative level, Horne conceded his tax liability rather than contest it further. On May 12, 1972, he sued defendant for damages for malpractice. On June 18, 1973, defendant filed a cross-complaint for indemnity against McIntosh and his law partnership. After a jury trial, judgment was entered against defendant on the complaint, and in favor of McIntosh on the cross-complaint.

I

Defendant's first argument on appeal is that "It is not legal malpractice (negligence) on the part of an attorney general practitioner to draw documents without doing research on a point of law on which there is no appellate decision or statute in point."

The argument has two parts; first, that the trust documents were in fact valid as a tax shelter, second, that even if invalid, their invalidity is so debatable that he should not be liable for making an error regard-

ing a matter about which reasonable attorneys can disagree. He is wrong on both points. The documents are invalid for their intended purpose, and the invalidity is rather obvious. To demonstrate this, one need go no further than the original *Clifford* case, from which the name "Clifford Trust" is derived, and the legislation it brought about.

In *Helvering* v. *Clifford* (1940) 309 U.S. 331 [84 L.Ed. 788, 60 S.Ct. 554], the United States Supreme Court held that notwithstanding "niceties of the law of trusts or conveyances, or the legal paraphernalia which inventive genius may construct as a refuge from surtaxes," (309 U.S. at p. 334 [84 L.Ed. at p. 79]), the grantor of a trust may be taxed as owner, depending on "an analysis of the terms of the trust and all the circumstances attendant on its creation and operation." (309 U.S. at p. 335 [84 L.Ed. at p. 791].)

In that case the taxpayer had established an irrevocable five-year trust, with himself as trustee and his wife as beneficiary. The trust corpus consisted of securities owned by the taxpayer. The income was payable to the wife, and the corpus reverted to the taxpayer at the end of five years. The Supreme Court ruled that "...the short duration of the trust, the fact that the wife was the beneficiary, and the retention of control over the corpus by [the taxpayer] all lead irresistably to the conclusion that [the taxpayer] continued to be the owner for purposes of § 22(a) [now § 61(a), defining gross income]." (*Ibid.*)

On the issue of control, the *Clifford* court made the following observations, which are directly applicable to this case: "So far as his dominion and control were concerned it seems clear that the trust did not effect any substantial change. In substance his control over the corpus was in all essential respects the same after the trust was created, as before. The wide powers which he retained included for all practical purposes most of the control which he as an individual would have. There were, we may assume, exceptions, such as his disability to make a gift of the corpus to others during the term of the trust and to make loans to himself. But this dilution in his control would seem to be insignificant and immaterial, since control over investment remained." (*Ibid.*)

In the present case, the Hornes, by control of the patent and the licensee corporation, also controlled the license. They not only retained the absolute power to control the income from the license agreement by increasing or reducing production of the patented product; they could also cease production entirely, form a new corporation, license it under

the patent, and individually receive all future royalties. This would effectively work a termination or revocation of the sole income generating asset of the trust.

Following the *Clifford* decision, the IRS adopted regulations to implement it, and these formed the basis for sections 671-678 of the Internal Revenue Code's 1954 revision, 26 United States Code sections 671-678. Directly applicable to the present case is section 675, which provides: "The grantor shall be treated as the owner of any portion of a trust in respect of which—

".    .    .    .    .    .    .    .    .    .    .    .    .    .

"(4)...A power of administration is exercisable in a nonfiduciary capacity by any person without the approval or consent of any person in a fiduciary capacity. For purposes of this paragraph, the term 'power of administration' means any one or more of the following powers: (A) a power to vote or direct the voting of stock or other securities of a corporation in which the holdings of the grantor and the trust are significant from the viewpoint of voting control;...."

Since the Hornes have always owned all the stock of the licensee corporation, and since Horne was the sole owner of the patent, clearly the "holdings of the grantor (who holds all of the stock) and the trust (which holds none of the stock) are *significant* from the viewpoint of voting control" where the sole asset of the trust is a license agreement entirely dependent for royalties (the income to be given favorable tax treatment) upon production of the patented product by the grantor's corporation. As we have seen, this arrangement permitted the Hornes at any time to render the trust valueless and to divert any income from production of the patented product to themselves or others.

If the *Clifford* decision and section 675 were to be deemed insufficient authority, *Commissioner v. Sunnen* (1948) 333 U.S. 591 [92 L.Ed. 898, 68 S.Ct. 715], cited by defendant himself, provides (and provided in 1967) further authority to establish the trust's invalidity as a Clifford Trust. In that case, the taxpayer owned 89 percent of the stock of Sunnen Products Company, a corporation manufacturing and selling patented grinding machines and other tools. The taxpayer himself owned various patents, and had entered into nonexclusive agreements licensing the corporation to manufacture and sell his patented devices in return for royalties. The corporation was not required to manufacture any particular number of devices and the agreements could be cancelled by six-month notice, but in the absence thereof, were

to continue in force for ten years. No notices of cancellation were ever given. The taxpayer assigned these license agreements to his wife as gifts. The Supreme Court held that the income therefrom was taxable to the taxpayer, citing, inter alia, *Helvering* v. *Clifford, supra,* 309 U.S. 331. The court refused to be drawn into an argument over whether the license agreements constituted "income" or "income-producing proper-ty," stating that that is a matter "which may become more metaphysical than legal." (333 U.S. at p. 604 [92 L.Ed. at p. 909].) Instead, it said, "The crucial question remains whether the assignor retains sufficient power and control over the assigned property or over receipt of the income to make it reasonable to treat him as the recipient of the income for tax purposes." (333 U.S. at p. 604 [92 L.Ed. at p. 909].)

Using language directly applicable to the present case, the court analyzed the realities of the situations as follows: "(1) As president, director and owner of 89% of the stock of the corporation, the taxpayer remained in a position to exercise extensive control over the license contracts after assigning them to his wife. The contracts all provided that either party might cancel without liability upon giving the required notice. This gave the taxpayer, in his dominant position in the corporation, power to procure the cancellation of the contracts in their entirety. That power was nonetheless substantial because the taxpayer had but one of the three directors' votes necessary to sanction such action by the corporation. Should a majority of the directors prove unamenable to his desires, the frustration would last no longer than the date of the next annual election of directors by the stockholders, an election which the taxpayer could control by reason of his extensive stock holdings. The wife, as assignee and as a party to contracts expressly terminable by the corporation without liability, could not prevent cancellation provided that the necessary notice was given.

"And it is not necessary to assume that such cancellation would amount to a fraud on the corporation, a fraud which could be enjoined or otherwise prevented. Cancellation conceivably could occur because the taxpayer and his corporation were ready to make new license contracts on terms more favorable to the corporation, in which case no fraud would necessarily be present. All that we are concerned with here is the power to procure cancellation, not with the possibility that such power might be abused. And once it is evident that such power exists, the conclusion is unavoidable that the taxpayer retained a substantial interest in the license contracts which he assigned.

"(2) The taxpayer's controlling position in the corporation also permitted him to regulate the amount of royalties payable to his wife. The contracts specified no minimum royalties and did not bind the corporation to manufacture and sell any particular number of devices. Hence, by controlling the production and sales policies of the corporation, the taxpayer was able to increase or lower the royalties; or he could stop those royalties completely by eliminating the manufacture of the devices covered by the royalties without cancelling the contracts.

"(3) The taxpayer remained the owner of the patents and the patent applications. Since the licenses which he gave the corporation were nonexclusive in nature, there was nothing to prevent him from licensing other firms to exploit his patents, thereby diverting some or all of the royalties from his wife.

"(4) There is absent any indication that the transfer of the contracts effected any substantial change in the taxpayer's economic status. Despite the assignments, the license contracts and the royalty payments accruing thereunder remained within the taxpayer's intimate family group. He was able to enjoy, at least indirectly, the benefits received by his wife. And when that fact is added to the legal controls which he retained over the contracts and the royalties, it can fairly be said that the taxpayer retained the substance of all the rights which he had prior to the assignments. See *Helvering v. Clifford, supra,* 335-336 [309 U.S. 331, 335, 336 (84 L.Ed. 791, 792, 60 S.Ct. 554)]." (*Sunnen,* 333 U.S. at pp. 608-610 [92 L.Ed. at pp. 911-912].)

Defendant attempts to distinguish *Sunnen* on the ground that (1) the license here was not subject to cancellation and (2) Horne would be "cutting his own throat" if he ceased manufacturing Perfect Plank Plus. Considered realistically, neither ground is accurate. As we have pointed out, the Hornes could bring about a transfer of all the royalty income from the patent to themselves, obviously without "cutting their own throats."

Recognizing the weakness of the attempt to distinguish *Sunnen,* defendant argues, "[t]he interesting question, though, presented by *Sunnen* regarding this case is if PECKHAM had not drafted the instruments to put the license in the trust and had, in fact, put the patent into the trust, would that have changed the result anyway even if he had done research? [I]rrespective of what had been done here, the control by the Plaintiffs, and especially plaintiff ROY HORNE, was so strong that there would be grave doubt (as confirmed by MCINTOSH) that whatever

had been done would have caused a damage in taxability of the income from use of the patent."

The short answer to this of course, is that if the patent itself were to be placed into the trust, that question too required research appropriate to the Hornes circumstances.

Defendant cites two cases for the proposition that a license agreement may be considered property so as to permit transfer of taxes upon its assignment, *Commissioner of Internal Revenue* v. *Reece* (1st Cir. 1956) 233 F.2d 30 and *Heim* v. *Fitzpatrick* (2d Cir. 1959) 262 F.2d 887. Defendant's own summary of these cases makes it clear that as stated in *Clifford* and *Sunnen,* taxability does not depend upon metaphysical distinctions in the law of property, but upon whether the grantor retains substantial control over the transferred asset. Both cases are easily distinguishable on the ground of control.

In light of the foregoing, it is apparent that there is no merit to defendant's contention that there was "no appellate decision or statute in point." Internal Revenue Code section 675 and the *Sunnen* case were very much in point.

## II

Defendant's second contention is that "An attorney in general practice does not have a duty to refer his client to a 'specialist' or to recommend the 'assistance of a specialist' or be guilty of malpractice."

· The court gave a jury instruction which states: "It is the duty of an attorney who is a general practitioner to refer his client to a specialist or recommend the assistance of a specialist if under the circumstances a reasonably careful and skillful practitioner would do so.

"If he fails to perform that duty and undertakes to perform professional services without the aid of a specialist, it is his further duty to have the knowledge and skill ordinarily possessed, and exercise the care and skill ordinarily used by specialists in good standing in the same or similar locality and under the same circumstances.

"A failure to perform any such duty is negligence."

This instruction is based upon California's Book of Approved Jury Instructions (BAJI), instruction No. 6.04, which is found in that work's section on medical malpractice. Its applicability to legal malpractice presents an issue of first impression. Defendant points out that legal specialties were not officially recognized in California until 1973, and therefore contends that he could not have had a duty in 1967 to refer his client to a specialist or to meet the standard of care of a specialist.

We cannot accept this contention. A California survey in 1968 revealed that two-thirds of the attorneys in the state at that time limited their practice to a very few areas, frequently to one only. (44 State Bar J. 140 (1969).) Thus, in the words of a leading treatise, the recent debate over *official* recognition of specialists must be considered "academic," for "[t]he reality is that many attorneys have become specialists." (Mallen & Levitt, Legal Malpractice (1977) § 114, p. 172.) Moreover, "[i]n those jurisdictions which recognize specialities or permit the attorney to make such a designation, taxation is one of the areas of law most commonly acknowledged." (*Id.,* § 268, p. 368.) Taxation also was one of the three specialties initially recognized in California. (See 51 State Bar J. 549, 555 (1976).)

Defendant himself recognized the existence of tax specialists in 1967 when he advised Horne in 1967 that he was not a tax expert, and that such experts existed. Of course, the fact that the specialty exists does not mean that every tax case must be referred to a specialist. Many tax matters are so generally known that they can well be handled by general practitioners. (See *Bucquet* v. *Livingston* (1976) 57 Cal.App.3d 914 [129 Cal.Rptr. 514].) But defendant himself acknowledged his need for expert assistance throughout his testimony, insisting he had no opinion of his own as to the tax consequences of the trust. Under the circumstances he cannot argue persuasively that it was error for the court to give the above quoted instruction.

### III

Defendant's next contention is that the question of law involved here was one upon which reasonable doubt may be entertained by well-informed lawyers, and therefore he should not be found liable for committing error. He relies upon *Lucas* v. *Hamm* (1961) 56 Cal.2d 583 [15 Cal.Rptr. 821, 364 P.2d 685], which held (as restated in *Smith* v. *Lewis* (1975) 13 Cal.3d 349, 359 [118 Cal.Rptr. 621, 530 P.2d 589, 78 A.L.R.3d 231]), that "the rule against perpetuities poses such complex

and difficult problems for the draftsman that even careful and competent attorneys occasionally fall prey to its trap."

■ But *Lucas* v. *Hamm* did not condone failure to do research, and *Smith* v. *Lewis* makes it clear that an attorney's obligation is not satisfied by simply determining that the law on a particular subject is doubtful or debatable: "[E]ven with respect to an unsettled area of the law, . . . an attorney assumes an obligation to his client to undertake reasonable research in an effort to ascertain relevant legal principles and to make an informed decision as to a course of conduct based upon an intelligent assessment of the problem." *(Id.,* at p. 359.) In other words, an attorney has a duty to *avoid* involving his client in murky areas of the law if research reveals alternative courses of conduct. At least he should inform his client of uncertainties and let the client make the decision.

In any event, as stated above, there was nothing sufficiently doubtful or difficult about the invalidity of the trust documents in this case to permit invocation of *Lucas* v. *Hamm* as controlling precedent.

## IV

■ The next argument is that as a matter of law the cause of action was barred by the statute of limitations. The period of limitations for legal malpractice is two years. (Code Civ. Proc., § 339, subd. 1.) It does not begin to run, however, until the plaintiff discovers or should have discovered the material facts constituting the cause of action (*Neel* v. *Magana, Olney, Levy, Cathcart & Gelfand* (1971) 6 Cal.3d 176 [98 Cal.Rptr. 837, 491 P.2d 421]) and suffers some "appreciable and actual harm" (*Budd* v. *Nixen* (1971) 6 Cal.3d 195, 201 [98 Cal.Rptr. 849, 491 P.2d 433]).

Plaintiffs testified they discovered defendant's malpractice at the time of an interview with Attorney Thomas Smail in August 1970. Plaintiffs' first item of claimed damage was Smail's bill for legal fees. The lawsuit was filed on May 12, 1972.

Defendant argues however, that ". . . the evidence is uncontradicted that in March 1970, the plaintiff. . . knew of such facts sufficient to put him on notice of [defendant's] alleged malpractice." Defendant further argues that if the original work was done negligently, plaintiffs' first damages accrued when they paid defendant's bill for that work in 1967.

The latter contention is without merit. To accept it would be to negate wholly the *Magana* and *Nixen* rule. No actual and true damage flowed from defendant's negligence until the trust was challenged and plaintiffs were forced to pay legal fees to defend the negligently drafted trust documents. Defendant points to no evidence that any such payments were made prior to May 12, 1970. Moreover, after the IRS notified plaintiffs of the deficiency in March 1970, they were initially represented by defendant.

A fiduciary relationship regarding the validity of the agreement continued between defendant and Horne until September 15, 1970. Horne initially hired defendant to repel the IRS attack on the trust and relied upon him, at least until his interview with Smail. Speaking to an analogous situation, the Supreme Court has said "the client may not recognize the negligence of the professional when he sees it. He cannot be expected to know the relative medical merits of alternative anesthetics, nor the various…exceptions to the hearsay rule. If he must ascertain malpractice at the moment of its incidence, the client must hire a second professional to observe the work of the first, an expensive and impractical duplication, clearly destructive of the confidential relationship between the practitioner and his client. [Fn. omitted.] [¶] In the second place, not only may the client fail to recognize negligence when he sees it, but often will lack any opportunity to see it…. In the legal field,the injury may lie concealed within the obtuse terminology of a will or contract." (*Neel* v. *Magana, Olney, Levy, Cathcart & Gelfand, supra,* 6 Cal.3d at p. 188.)

In any event, the date on which plaintiffs should have discovered their cause of action constituted a factual issue, resolved against defendant on appropriate instructions. There is substantial evidence to support the jury's implied finding.

## V

Defendant argues that plaintiffs cannot maintain their cause of action in the absence of a prior legal determination of the validity of the trust in a court of competent jurisdiction, citing *Westlake Community Hosp.* v. *Superior Court* (1976) 17 Cal.3d 465 [131 Cal.Rptr. 90, 551 P.2d 410]. The *Westlake* case does not assist defendant. It is nothing more than a variation of the firmly ingrained legal doctrine of exhaustion of administrative remedies. (See 2 Witkin, Cal. Procedure (2d ed. 1970) Actions, § 181, p. 1045, § 186, p. 1048.)

It is always true of course that a wrongdoer is not required to compensate an injured party for damages which are avoidable by reasonable effort. (*Green* v. *Smith* (1968) 261 Cal.App.2d 392 [67 Cal.Rptr. 796].) The jury here was instructed on mitigation of damages (BAJI No. 14.68). But the mitigation doctrine does not require the injured party to take measures which are unreasonable or impractical, or which involve expenditures disproportionate to the loss sought to be avoided, or which may lie beyond his financial means. In light of our expressed opinion regarding the trust's invalidity to supply a tax benefit, we cannot say as a matter of law that plaintiffs acted unreasonably in abandoning further legal efforts to gain a favorable tax ruling.

## VI

■ Finally, defendant asserts error in giving the following jury instruction: "In order to prevail on his cross-complaint, PECKHAM must prove that any loss suffered was caused by the sole negligence of cross-defendant MCINTOSH." We sustain this contention, for the doctrines of indemnity (express and implied), and contribution are grounded upon the existence of some negligence on the part of the one seeking indemnity or contribution. However, the error was not prejudicial, because the jury was asked to and did render a special verdict to the question "Was defendant ... actively negligent in causing plaintiff Horne's injury?", it answered "Yes"; and this after hearing and rehearing a thorough and legally correct instruction on active-passive negligence submitted by defendant. Given a specific finding of active negligence on defendant's part, he could not recover on an implied indemnity theory (see *Kerr Chemicals, Inc.* v. *Crown Cork & Seal Co.* (1971) 21 Cal. App.3d 1010, 1014-1017 [99 Cal.Rptr. 162]), and the erroneous instruction was academic.

Defendant also argues that inasmuch as the doctrines of active and passive negligence have been repudiated by the Supreme Court's decision in *American Motorcycle Assn.* v. *Superior Court* (1978) 20 Cal.3d 578, 591-599 [146 Cal.Rptr. 182, 578 P.2d 899], we should apply that case retroactively and reverse the present judgment as to McIntosh. This we cannot do, because the issue was not properly preserved in the trial court. (*Safeway Stores, Inc.* v. *Nest-Kart* (1978) 21 Cal.3d 322, 333 [146 Cal.Rptr. 550, 579 P.2d 441].)

The judgment is affirmed.

Evans, J., and Reynoso, J., concurred.

A petition for a rehearing was denied October 24, 1979, and the opinion was modified to read as printed above.